IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SCIERAN TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1319 (SLR) |
| | ) | |
| v. | ) | |
| | ) | REDACTED VERSION |
| BAUSCH & LOMB INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

**BAUSCH & LOMB'S APPLICATION FOR *IN CAMERA* INSPECTION
PURSUANT TO THE STIPULATED PROTECTIVE ORDER**

Pursuant to paragraph 17 of the stipulated protective order (D.I. 43), defendant

Bausch & Lomb Incorporated ("B&L") requests an *in camera* inspection of a July 2004 e-mail

from Rod Ross, of one the named inventors of the patents-in-suit, to Paul Lerner, of General

Patent Corporation International ("GPCI"), that was allegedly inadvertently produced, and an

order compelling the production of that document, on the basis that it was not privileged and,

even if it were, the privilege has been waived.  Specifically, Mr. Ross recently denied at his

deposition that he knew anything about the structure of a prototype surgical cutting device that

had been brought to him by a company called Noetix (Ex. A, 8/11/05 Ross Tr. at 63).  Yet Mr.

Ross included contradictory information in the July 2004 e-mail, which was produced to B&L

and then returned as a result of a claim that it was privileged and inadvertently produced.

Paragraph 17 provides that in the case of a request such as this, the "producing party shall submit

the documents…at issue to the Court for *in camera* inspection."[1]

---

[1]    Paragraph 17 of the protective order provides:

> The inadvertent production in discovery of any privileged or
> otherwise protected or exempted information…shall not be
> deemed a waiver or impairment of any claim of privilege or

(continued. . . )

## STATEMENT OF FACTS

Plaintiff Scieran Technologies, Inc. ("Scieran") filed this action for infringement of two patents on September 30, 2004 (D.I. 1). The accused devices are high-speed surgical cutters used in an ophthalmic procedure called a vitrectomy to remove tissue from the eye. They are "guillotine" cutters that have an inner and an outer cutter, where the inner cutter reciprocates inside the outer one. Tissue enters a port in the outer cutter and is sheared when the inner cutter slides forward.

### A.    The Dealings Between Noetix and Scieran Before Scieran's Patent Application

In 1993, Michael Miller of Noetix invented a surgical device with a reciprocating inner cutter that had a circumferential slit (sometimes called a "living hinge"), and filed a patent application disclosing this invention (Ex. B).

By 1994, Noetix built prototypes of Mr. Miller's device for use in vitrectomies, and gave them to its consultant, Alan Schechter, to find a company that would market the device. Dr. Schechter began discussions with Mr. Ross, told him about the circumferential slit on the

---

(. . . continued.)

> protection... provided that the producing party shall promptly provide notice to the receiving party in writing when inadvertent production is discovered. Upon receiving written notice from the producing party that privileged information or work-product material has been inadvertently produced, such information shall be returned to counsel for the producing party and the receiving party shall not use such information for any purpose except application to the Court until further Order of the Court. In response to an application to the Court by the receiving party to compel production of such information, the producing party shall submit the documents or testimony at issue to the Court for *in camera* inspection.

prototypes' inner cutters, and showed him drawings from Mr. Miller's patent application.  Mr.

Ross then formed plaintiff Scieran for the purpose of marketing Noetix's cutter.

Throughout 1995, Noetix provided these prototypes to Mr. Ross (and to Chris

Boore, another named inventor) to assist with Scieran's efforts to fund the project.  Negotiations

fell apart in the fall of 1995.

Messrs. Ross and Boore – with Greggory Hughes, another named inventor – then

allegedly designed their own vitrectomy device in late 1995.  The vitrectomy device they

supposedly designed had a circumferential slit on the inner cutter, just like the Noetix prototypes.

Even though Mr. Ross had seen the drawings from Mr. Miller's patent application, the inventors

tried to patent an inner cutter with a circumferential slit.

Figure 3 of the Miller patent is set forth below (20 is the inner cutter and 40 is the

"hinge slot" that is "cut circumferentially" around the inner cutter):



**Fig. 3**

Figure 6 of the patents-in-suit is set forth below (104 is the inner cutter (called an

"inner sleeve") and 112 is the "circumferential slit"):



**FIG. 6**

3

Figure 6 of the patents-in-suit is identical in all material respects to Figure 3 of the Miller patent.  They are just facing opposite directions.  The inventors, however, did not tell the PTO that Noetix had brought them a prototype with an inner cutter that had a circumferential slit.  In fact, they did not tell the Examiner anything about Noetix – not a word.

### B.    Mr. Ross Changes His Story

REDACTED

On May 23, 2005, Irell & Manella (the law firm that prosecuted the patents-in-suit) produced documents in response to B&L's subpoena.  One document (Irell 147) was a July 2004 e-mail from Mr. Ross to Mr. Lerner of GPCI.[3]  Although Mr. Lerner is an attorney, GPCI "is not a law firm, and [does] not offer legal advice or provide legal services" (Ex. C).[4]  Nevertheless, on June 2, Irell & Manella advised B&L that Irell 147 was privileged, had been inadvertently produced, and requested that B&L return it.  Pursuant to the protective order, B&L returned the document and destroyed all copies of it.

REDACTED

---

REDACTED

[3]    Scieran retained GPCI to assist with its efforts to license and enforce the patents-in-suit.

[4]    Scieran has refused to produce its agreement with GPCI – a document that would further explain the nature of the relationship between Scieran and GPCI – on the basis that it is privileged and not relevant.

On June 6, 2005, Scieran responded to B&L's interrogatories, which Mr. Ross verified. Scieran – surprisingly – stated that "Plaintiff was unaware of the particular structure of the inner cannula of the Vit Commander System developed by Noetix/Promex" (Ex. D at 12; *id.* at 5).[5]

At his deposition on August 11, Mr. Ross testified that Dr. Schechter did not tell him anything about the structure of the Noetix prototype (Ex. A).

REDACTED

Now, in the litigation, Mr. Ross has completely changed his story – both in interrogatory responses and at his deposition. Mr. Ross' earlier statement in his July 2004 e-mail is plainly highly relevant to the validity and enforceability of his patents.

_____

[5]    Promex is the successor to Noetix.

5

**ARGUMENT**

I.    **THE APPLICABLE LAW**

Scieran has the burden of proving that the attorney-client privilege applies and has not been waived. Interfaith Housing Delaware, Inc. v. Town of Georgetown, 841 F. Supp. 1393, 1397 (D. Del. 1994). In the Third Circuit, the attorney-client privilege is construed "narrowly," because it "obstructs the truth-finding process." Westinghouse Elec. Corp. v. The Republic of the Philippines, 951 F.2d 1414, 1423 (3d Cir. 1991). The attorney-client privilege protects only communications to an attorney for the purpose of obtaining legal advice. See, e.g., Willemijn Houdstermaatschaapij B.V. v. Apollo Computer, Inc., 707 F. Supp. 1429, 1442 (D. Del. 1989); see also Tulip Computers Int'l, B.V. v. Dell Computer Corp., 210 F.R.D. 100, 104 (D. Del. 2002); Rohm and Haas Co. v. Brotech Corp., 85 F. Supp. 793, 795 (D. Del. 1993).

In addition, it is axiomatic that the attorney-client privilege protects only communications, not facts. Upjohn Co. v. United States, 449 U.S. 383, 395 (1981). "A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer; nor can a litigant refuse to disclose facts simply because that information came from a lawyer." Rhone-Poulenc Rorer Inc. v. The Home Indemnity Company, 32 F.3d 851, 864 (3d Cir. 1994).

Moreover, a party waives the attorney-client privilege by using it both as a sword and shield. E.g., Medtronic Inc. v. Guidant Corp., C.A. No. 03-848 (SLR) (D. Del., Oct. 25, 2004) ("…the court has concluded that defendants are using the attorney-client privilege as both a sword and a shield. Therefore, the privilege is deemed waived….") (Ex. F); see also Synalloy Corp. v. Gray, 142 F.R.D. 266, 269 (D. Del. 1992) ("…the attorney-client privilege cannot at once be used as a shield and a sword.") (quoting U.S. v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir.

1991)).  Waiver is appropriate when it would be "manifestly unfair" to allow a party to make factual assertions and then to deny its adversary "an opportunity to uncover the foundation for those assertions in order to contradict them."  Int'l Paper Co. v. Fibreboard Corp., 63 F.R.D. 88, 92 (D. Del. 1974); see also Friction Div. Prods., Inc. v. E.I. duPont de Nemours & Co., 117 F.R.D. 535, 538 (D. Del. 1987).  This is exactly what Scieran is trying to do.

## II.    IRELL 147 SHOULD BE ORDERED PRODUCED.

Mr. Ross has recently testified that Dr. Schechter did not tell him anything about the structure of the inner cutter of the Noetix prototype.

REDACTED

What Mr. Ross was told by Dr. Schechter, what he previously believed, and what he now believes, are not privileged.  Thus, any statements by Mr. Ross in Irell 147 as to what Dr. Schechter told him are not privileged.  In any event, Irell 147 is an e-mail from Mr. Ross to Mr. Lerner of GPCI, which is not a law firm and does not provide legal advice.  Irell 147 was not a communication from a client to a lawyer seeking legal advice and is not privileged for that reason.

Even if these statements were privileged, however, Scieran is using the privilege to shield Mr. Ross' statement about what Dr. Schechter told him, while putting forward in sworn interrogatory answers and testimony the new story that Dr. Schechter told him nothing.  It would be unfair to allow Mr. Ross' testimony and Scieran's interrogatory responses to stand, and to permit Scieran to withhold a document that contradicts those statements.[6]

---

[6]    B&L's application is supported by the Rules of Professional Conduct.  Scieran's counsel sat silently when Mr. Hughes, who was copied on Irell 147, testified that he did not know of any documents where Mr. Ross discussed his knowledge about the structure of the Noetix prototype (Ex. G, Hughes Tr. at 24-25), and did the same thing during Mr. Ross'
(continued. . . )

This is particularly so given that Mr. Ross destroyed other documents that might have contradicted his testimony, in contemplation of this litigation. Mr. Ross testified that he destroyed 75% of Scieran's documents after he knew that Scieran would likely sue B&L for patent infringement (Ex. H, 8/11/05 Ross Tr. at 48). In fact, one of the destroyed documents appears to be a January 1995 letter from Dr. Schechter providing information about Noetix's cutter and patents (id. at 168-69). Mr. Ross does not remember what information was provided (id.).

In short, Scieran wants to be able to have Mr. Ross tell his August 2005 "facts" in this litigation, and to be able to withhold Mr. Ross' July 2004 "facts" to the contrary. Scieran is trying to use the privilege to shield the "facts" Mr. Ross knew last year, while promoting this year's version to the Court and to the jury. It should not be permitted to do so.

---

(. . . continued.)
similar testimony (Ex. E). Scieran's counsel did nothing to correct the record, even after B&L's counsel informed it that it believed Mr. Ross had testified inconsistently with Irell 147. See ABA MODEL RULES OF PROF'L CONDUCT, Rule 3.3(a)(3) ("If...the lawyer's client...has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."); see also DEL. LAWYERS' RULES OF PROF'L CONDUCT, Rule 3.3(a)(3) (same).

## CONCLUSION

B&L respectfully requests that the Court conduct an *in camera* review of Irell 147 and order its production.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Leslie A. Polizoti

_____

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
*Attorneys for Bausch & Lomb Incorporated*

Original Filing Date:  August 31, 2005
Redacted Filing Date: September 2, 2005

481540

## RULE 7.1.1 CERTIFICATE

I hereby certify, pursuant to D. Del. LR 7.1.1, that counsel for Bausch & Lomb Incorporated has made a reasonable effort to reach agreement with counsel for Scieran Technologies on the matters set forth in the foregoing motion, and the parties have not been able to reach agreement thereon.


/s/ Leslie A. Polizoti

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to Josy W. Ingersoll.

I also certify that on September 2, 2005, I caused to be served true and correct copies of the foregoing document on the following in the manner indicated below:

### BY HAND

Josy W. Ingersoll
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY FEDERAL EXPRESS

Edward O'Connor
Craig McLaughlin
O'CONNOR CHRISTENSEN & MCLAUGHLIN LLP
1920 Main Street, Suite 150
Irvine, CA 92614

/s/ Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT AND TUNNELL
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com