# Exhibit   A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

## C.A. # 04-1319 SLR

---

Transcript of:

Rodney L. Ross

**August 11, 2005**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 62

1  Mr. Schechter on the vitrectomy system?
2      A.  Seemed like a number of months.
3      Q.  And what was done during that number of months?
4      A.  Well, we went back into surgery I think once or
5  twice more with Dr. McBeath. And then I think -- I
6  believe we took it into surgery with Dr. Tornambe.
7      Q.  The "it" that you took in was prototypes that
8  Mr. Schechter had?
9      A.  Correct.
10     Q.  How many prototypes did he have?
11     A.  Prototype consoles or --
12     Q.  No. I'm sorry. The prototype handpieces and
13  cutters.
14     A.  The most I ever saw at one time was one or two.
15  So I don't know how many he had.
16     Q.  Did he have one console?
17     A.  At one time that's the most I ever saw was just
18  one, but I don't know how many he had.
19     Q.  And one foot pedal?
20     A.  Correct.
21     Q.  And one or two prototypes?
22     A.  Right.
23     Q.  How many times in 1994 and 1995 did you see
24  Mr. Schechter's prototypes?

Page 63

1      A.  I would guess maybe three or four.
2      Q.  And when you were moving forward with
3  Mr. Schechter, you named his system the Vit Commander; is
4  that right?
5      A.  Correct.
6      Q.  What did Mr. Schechter tell you about the
7  structure of the inner cutter of his prototypes?
8          MR. McLAUGHLIN: Objection. Assumes facts.
9      A.  He didn't tell me anything. He was very, very
10  secretive.
11     Q.  You didn't know anything at all about the
12  structure --
13     A.  That's correct.
14     Q.  Did you ever take one of the prototypes apart to
15  see what the inner cutter looked like?
16     A.  We did not.
17     Q.  No one at Scieran did not?
18     A.  No.
19     Q.  Did Mr. Schechter ever tell you anything about a
20  device called the Diskecter?
21     A.  He told me that he either had developed a system
22  for them or he had some connection to -- on the
23  Diskecter. He either developed it or he did something.
24     Q.  And who was the "them"?

Page 64

1      A.  The company that owned the Diskecter, Danek.
2      Q.  Did you know that Danek was selling the
3  Diskecter as a commercial product?
4      A.  I believe -- I believe so.
5      Q.  And that was in the 1994/1995 time frame; is
6  that right?
7      A.  Yes.
8      Q.  Did you know what the Diskecter was used for?
9      A.  It had something to do with orthopedic surgery.
10     Q.  Were you told that the design of the vitrectomy
11  device that Mr. Schechter brought to you was based on the
12  design of the Diskecter?
13     A.  I don't remember exactly what he told us about
14  the connection there, but Mr. Schechter did show me two
15  patents that he had, and, as I recall, they were under
16  his name, and I just assumed that that's what the Danek
17  system was based on.
18     Q.  Did he tell you anything about the inner cutter
19  of the Diskecter?
20     A.  He did not.
21     Q.  Did you ever see any Danek documents about the
22  inner cutter of the Diskecter?
23     A.  We did eventually.
24     Q.  And when was that?

Page 65

1      A.  That was sometime later. Would have been -- it
2  was sometime after we filed our patent I recall.
3      Q.  Do you remember what that design was?
4      A.  As I recall, the document that I saw, it seemed
5  like it had a notch in the top of the cannula.
6      Q.  Have you ever seen a Diskecter?
7      A.  No, I have not.
8      Q.  Do you know whether it has a circumferential
9  slit?
10     A.  I don't know that.
11     Q.  Do you know whether it has a prebent tip?
12     A.  I don't know that, either. I have not seen a
13  system.
14     Q.  Did you ever ask Mr. Schechter what the design
15  of the Diskecter inner cutter was?
16     A.  No, I did not.
17     Q.  Why not?
18     A.  He was just very secretive about every aspect of
19  his business. And we didn't have a confidentiality
20  agreement.
21     Q.  Did you learn that Mr. Schechter was affiliated
22  with a company called Noetix?
23     A.  Mr. Schechter?
24     Q.  Uh-huh.

17 (Pages 62 to 65)

Exhibit   B

US005782849A

# United States Patent [19]

## Miller

[11] Patent Number: 5,782,849

[45] Date of Patent: Jul. 21, 1998

[54] SURGICAL CUTTING INSTRUMENT

[75] Inventor: Michael E. Miller, Indianapolis, Ind.

[73] Assignee: SDGI Holdings, Inc., Wilmington, Del.

[21] Appl. No.: 278,558

[22] Filed: Jul. 21, 1994

### Related U.S. Application Data

[63] Continuation of Ser. No. 59,324, May 7, 1993, abandoned.

[51] Int. Cl.$^6$ ........................................ A61B 17/00
[52] U.S. Cl. ................... 606/159; 604/22; 606/170
[58] Field of Search ..................... 604/22; 606/159,
606/170, 171, 180; 128/757

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,815,604 | 6/1974 | O'Malley et al. | 604/22 |
| 4,011,869 | 3/1977 | Seiler, Jr. | 604/22 |
| 4,819,635 | 4/1989 | Shapiro | 604/22 |
| 5,106,364 | 4/1992 | Hayafuji et al. | 604/22 |
| 5,226,910 | 7/1993 | Kagiyama et al. | 604/22 |

*Primary Examiner*—Michael Powell Buiz
*Assistant Examiner*—William W. Lewis

*Attorney, Agent, or Firm*—Woodard, Emhardt, Naughton, Moriarty & McNett

[57]    **ABSTRACT**

A surgical cutting instrument for cutting joint tissue includes an outer tubular member, or cannula, sized for percutaneous insertion into an anatomical space, such as s joint space in the spine. The outer tubular member has a cutting opening at its blunt-tipped distal end. The proximal end is supported by a handpiece. A cutting member is slidably disposed within the outer tubular member and includes a tubular cutting head portion defining an end opening and a cutting edge at the end opening. In the specific embodiment, the cutting member is a tubular tubular member having a cutting head portion at its distal end and a body portion extending therefrom to the handpiece. A hinge is integrally formed in the tubular cannula to connect the cutting head portion with said body portion, to permit pivoting of the cutting head portion relative to the body portion. As the cutting member is reciprocated within the outer cannula, the cutting edge contacts tissue drawn into the cutting opening. Resistance from the tissue causes the cutting head to pivot about the hinge to form an essentially zero clearance between the cutting head and the cutting opening in the outer cannula.

**11 Claims, 3 Drawing Sheets**





**Fig. 1**



**Fig. 2**



**Fig. 3**



**Fig. 4**



**Fig. 5**



**Fig. 6**



**Fig. 7**



**Fig. 8**

5,782,849

1

## SURGICAL CUTTING INSTRUMENT

This application is a continuation of application Ser. No. 08/059,324, filed May 7, 1993, now abandoned.

## BACKGROUND OF THE INVENTION

The present invention relates to a percutaneous or intra-trocar surgical instrument for the excision and removal of a wide range of tissues. More particularly, a surgical cutting instrument is disclosed which is particularly adapted for a wide range of operating speeds and which is capable of cutting tough tissue, such as may be found during orthopaedic or spinal surgery. The present invention has application in a wide range of procedures, although the following disclosure will pertain principally to minimally invasive cutting instruments used in the orthopaedic or spinal surgical fields.

In the field of spinal surgery, one problem that is frequently diagnosed and treated concerning degeneration or herniation of the intervertebral disk. In the past, treatment of these diagnosed conditions has required complicated and highly invasive surgical procedures, often involving some degree of fusion between adjacent vertebrae serviced by the affected intervertebral disk. In these procedures it is important that the affected disk be entirely removed for replacement by bone graft material. In some cases, a prosthetic disk may be implanted.

Within the last decade, techniques for percutaneous diskectomies have been developed. One such system is described in the patent to Onik, U.S. Reissue Pat. No. 33,258. The Onik device, like other known devices, is a "tube within a tube" cutting instrument which incorporates a reciprocating inner cutting sleeve operating within the central bore of an outer cutting sleeve. Typically, the excised disk material is suspended in a saline irrigation fluid which is aspirated through the central passageway of the inner cutting sleeve.

Similar cutting devices are represented in U.S. Pat. Nos. 4,246,902 to Martinez, and 5,106,364 to Hayafuji. While these aforementioned devices utilize linearly reciprocating cutters, another genre of surgical instruments implement a rotary cutting action. Such a device is represented by the patent to Bonnell et al., U.S. Pat. No. 4,203,444.

The tissue cutting instruments presently available in the art suffer from a variety of problems. For example, rotary cutters have a tendency to become clogged as the excised tissue "spools" or winds around the shaft driving the rotating cutter blade. This spooling can clog the aspiration channel of the cutter and even stall the blade or motor.

Another problem common between rotary and linearly reciprocating devices is their general inability to cut very tough tissue, at least using an instrument that is adapted for percutaneous insertion. Certainly larger cutting instruments driven by larger motors are capable of cutting very tough or hard tissue. However, no prior device has been able to avoid the trade-off between a minimally invasive cutting instrument and the ability to cut these types of tough tissue.

There is a need in the field of tissue excision and removal for a surgical cutter that is adapted for minimally invasive uses, but that is still capable of cutting hard or tough tissue encountered in spinal and orthopaedic procedures, for example. The cutting instrument must be capable of excising the tissue cleanly, without tearing, and of aspirating the tissue pieces efficiently and without clogging. These and other needs in the industry are addressed by the present invention.

2

## SUMMARY OF THE INVENTION

A surgical cutting instrument is provided for cutting tissue inside a joint space, such as disk material between two vertebrae. The instrument has further application for cutting tissue in other anatomical spaces, for instance the gall bladder or prostate. The instrument includes an outer cannula sized for percutaneous insertion into the joint space. The outer cannula has a cutting opening at its blunt-tipped distal end and is supported at its proximal end by a hand-piece. A cutting member is slidably disposed within the outer cannula which includes a tubular cutting head portion defining an end opening and a cutting edge at the end opening.

In one specific embodiment, the cutting member is a tubular cannula having a cutting head portion at its distal end and a body portion extending therefrom to the handpiece. A hinge is integrally formed in the tubular cannula to connect the cutting head portion with said body portion, to permit pivoting of the cutting head portion relative to the body portion. As the cutting member is reciprocated within the outer cannula, the cutting edge contacts tissue drawn into the cutting opening. Resistance from the tissue causes the cutting head to pivot about the hinge to form an essentially zero clearance between the cutting head and the cutting opening in the outer cannula.

Preferably, the cutting member is a single tubular cannula. A diametrical slot is defined in the cannula to form a hinge segment separating the cutting head and body portions of the cutting member. In the preferred embodiment, the slot extends through about 90% (ninety percent) of the inner cannula diameter. It has been found that this slot configuration yields a hinge segment that is strong enough to withstand cyclic loading yet flexible enough to allow the cutting head portion to pivot when resisted by tissue in the cutting opening.

The tubular cutting member defines an aspiration passageway and is connected at its proximal end to a vacuum source. The vacuum draws tissue through the cutting opening in the outer cannula. As the inner cutting member is stroked toward the distal end of the cannula, its cutting edge contacts the tissue projecting into the outer cannula. The tissue inherently resists the cutting motion of the member, so that as the cutting member continues in its stroke the cutting head portion is pushed or pivoted toward the cutting opening of the outer cannula. The greater the force applied to the tissue, the greater the pivoting of the cutting head portion, until a zero clearance condition is established between the inner and outer cutting edges. The tissue is then effectively and completely sheared and aspirated back through the instrument.

In another embodiment, the inner cutting member or cannula includes a support segment extending from the hinge segment. This support segment is essentially an extension of the hinge segment along the remaining length of the inner cutting member. Only the cutting head in this embodiment constitutes a full cylindrical segment. One advantage realized by this embodiment, in addition to the hinge effect previously described, is a reduction in the sliding friction between the reciprocating inner cutting member and the outer cannula.

A further embodiment contemplates a longitudinal slot in the cutting head, in combination with the circumferential slot forming the hinge segment. This longitudinal slot extends from the cutting edge of the inner cutting member to the circumferential hinge slot to permit circumferential expansion or contraction of the cutting head. Circumferential expansion of the cutting head (that is by widening the

5,782,849

3

longitudinal slot) further ensures a zero clearance between the cutting of the inner member and the cutting opening of the outer cannula. Circumferential contraction of the cutting head on the return stroke can reduce sliding friction between the reciprocating inner member and the outer cannula.

One object of the present invention is to provide a surgical cutting instrument that is adapted for percutaneous insertion into an anatomical space, such as a joint space in the spine. A further object resides in providing such an instrument that can cleanly and efficiently excise unwanted tissue without clogging and without tearing the subject tissue.

Yet another object is achieved by one feature of the invention providing for a single piece tubular cutting member with a hinge formed in the member. Other objects, benefits and advantages of the invention will become apparent from the following written description and accompanying figures.

DESCRIPTION OF THE FIGURES

FIG. 1 is a partial cutaway view of a surgical cutting instrument in accordance with a preferred embodiment of the present invention.

FIG. 2 is a side cross-sectional view of the cutting instrument in FIG. 1, taken along line 2—2 as viewed in the direction of the arrows.

FIG. 3 is a side cross-sectional view similar to the view in FIG. 2 depicting the instrument with the blade positioned to cut a segment of tissue.

FIG. 4 is a top elevational view of the inner cutting member or cannula showing the cutting head and hinge segment.

FIG. 5 is a side partial cutaway view of an alternative embodiment to the surgical cutting instrument of the present invention.

FIG. 6 is a cross sectional view of the cutting head of the alternative embodiment, taken along line 6—6 as shown in the direction of the arrows in FIG. 5.

FIG. 7 is a bottom elevational view of another embodiment of the inner cutting member showing a cutting head similar to that depicted in FIG. 4 with the provision of a longitudinal slot.

FIG. 8 is a pictorial representation of the inner cutting member of FIG. 7.

DESCRIPTION OF THE PREFERRED
EMBODIMENTS

For the purposes of promoting an understanding of the principles of the invention, reference will now be made to the embodiments illustrated in the drawings and specific language will be used to describe the same. It will nevertheless be understood that no limitation of the scope of the invention is thereby intended, such alterations and further modifications in the illustrated device, and such further applications of the principles of the invention as illustrated therein being contemplated as would normally occur to one skilled in the art to which the invention relates.

A surgical cutting instrument 10 is shown in FIG. 1 which is adapted for percutaneous insertion at the surgical site, and is specifically adapted to cut tissue in the spinal region. However, the same instrument could be used in other orthopaedic, such as an arthroscopic surgery of the knee, or similar surgical procedures, such as removal of the gall bladder or prostate. The instrument 10 includes a hand piece 11 which supports an outer cannula 13. The outer cannula

4

has a blunt distal tip 15 to minimize trauma to tissue as the cutting instrument is manipulated in the surgical site. The outer cannula 13 includes a cutting opening 14 formed therethrough which opens to a central bore 16 extending through the length of the cannula 13. The cutting opening 14 defines a cutting edge 18, which in the preferred embodiment is defined by a beveled cut in the wall of the outer cannula. In the preferred embodiment, the cutting opening 14 is in the shape of an isosceles triangle. The cutting edge 18 in the specific embodiment is defined at the side of the triangle, but excludes the base of the triangular shape as shown in FIG. 1.

The cutting instrument 10 further includes an inner cannula 20 which is slidably and concentrically disposed within the outer cannula 13. The inner cannula 20 terminates in a cutting edge 22 at the end opening 23 of the cannula. The end opening 23 opens into an aspiration passageway 25 extending through the entire length of the inner cannula 20.

The outer cannula 13 is supported by the hand piece 11, while the inner cannula 20 also extends into the hand piece 11 to engage a drive mount 30 at a cannula support portion 33. The drive mount is engaged to a drive rod 31 that is connected to a motor or suitable mechanism for providing reciprocating motion. Specifically, the drive rod 31 and mount 30 reciprocate axially in the direction of the arrows R shown in FIGS. 1 and 2. Since the inner cannula 20 is fixed to the drive mount 30 it too reciprocates within the outer cannula 13. As the inner cannula, 20 reciprocates, the inner surface of the outer cannula and the outer surface of the inner cannula operate as a bearing surface for the smooth movement of the inner cannula.

The drive mount 30 includes an aspiration chamber 34 which is connected through an aspiration tube 36 to a suitable vacuum source and tissue collection chamber in a manner well known in the art. In this particular embodiment, the aspiration tube 36 is engaged to the reciprocating drive mount 30. This aspect requires the definition of a slot 38 in the hand piece 11 to allow the tube 36 room to move as it reciprocates with the drive mount.

As thus far described, the instrument 10 incorporates many features of known reciprocating cutters, particularly those implementing the "tube within a tube" approach. However, it has been found that these types of cutters are inherently limited in the type of tissues that can be cut and in the cutting speeds at which they are capable of operating. The present invention provides a means to allow the cutting instrument 10 to cut much tougher tissue than prior art devices, while still maintaining the minimally invasive dimensions of the instrument for percutaneous or intratrocar insertion. More specifically, the inner cannula 20 includes a hinge slot 40 cut circumferentially around the cannula. The hinge slot 40 defines a hinge segment 41 at the uncut portion of the cannula. This hinge segment 41 is, in essence, a narrow arc segment of a tubular formed inner cannula. The slot 40 further defines a cutting head 43 connected by the hinge segment 41 to the remaining body portion 44 of the cannula 20.

The particular benefit of this configuration for the inner cannula 20 is depicted more clearly in FIG. 3. (It is understood that the relative dimensions of the cutter components have been exaggerated for clarity.) It is known that as a reciprocating cutter engages and attempts to sever tissue T drawn into the cutting opening the tissue inherently resists the cutting action. As a portion of tissue $T_1$ is being severed, it exerts a reactive force F against the cutting edge 22 of the inner cannula 20. In a typical tube within a tube reciprocat-

5,782,849

5

ing cutter, this reactive or resistive force F is withstood by the cannula without any significant bending or movement of the solid inner cannula. Thus, with prior devices the clearance between the cutting edge remains constant, which permits a strand of tissue to remain in the gap between the inner and outer tubes. Frequently, the tissue is not excised on the first stroke of the cutting blade.

In accordance with the present invention, with the introduction of the hinge slot 40 and hinge segment 41 the cutting head 43 is permitted to pivot in the direction of the arrow P in FIG. 3. As the inner cannula 20 advances toward the cutting opening 14 of the outer cannula, it maintains a clearance C between the two tubes. Once the cutting head 43 contacts the tissue it pivots so that the cutting edge 22 forms a zero clearance interface with the cutting edge 18 of the outer cannula cutting opening 14. This zero clearance facilitates cutting the tissue segment $T_1$, completely severing a strand of tissue between the inner and outer cannulae. This feature eliminates the gap, typically exists between the cutting edges of the prior art devices. With the hinge segment 41 and pivot capability for the cutting head 43 of the present invention, a fully efficient cut is made and the subject tissue $T_1$ is completely and cleanly cut from the main body of tissue T. The excised tissue $T_2$ is then drawn in the direction of the arrow A through the end opening 23 and the aspiration passageway 25 defined through the body portion 44 of the inner cannula.

In the preferred embodiment, each of the cutting components, specifically the outer cannula 13 and the inner cannula 20, are formed of stainless steel, preferably 304SS typically used in medical grade components. In prior art devices, it is generally critical to maintain exact dimensions of the outer and inner cannula. Ideally, a zero clearance between the two components is desired to permit a more efficient cutter. However, the zero clearance also results in high friction which reduces the speed capability of the instrument or requires a higher power motor to reciprocate the inner cannula within the outer cannula. On the other hand, larger tolerances make the problem of tissue strands even greater as the tissue has more room to "hide" from the cutting edges. Prior art devices must wrestle with these clearance issues. With the present invention, the requirements for high a tolerance close fit between the inner and outer cannula components is eliminated. It has been found that the hinge slot 40 and hinge segment 41 readily accommodate cutting instruments which are toleranced to +0.025 mm on both the inner diameter of the outer cannula and the outer diameter of the inner cannula.

In one specific embodiment, the cutting opening 14 has a width W, as shown in FIG. 1, that is equal to approximately one half the inner diameter $D_1$ (see FIG. 3) of the outer cannula 13. The cutting opening 14 is placed as close to the rounded distal tip 15 as possible. To readily permit percutaneous insertion of the instrument, the outer diameter of the outer cannula 13 is preferably less than about 5 mm. Thus, this dimension would dictate a cutting opening width W of about 2½ mm.

The cutting head 43 of the inner cannula 20 has a length L (FIG. 4) which is long enough to allow the entire width of the cutting opening 14 to be occluded at the end of the stroke of the inner cannula 20. Thus, the length L of the cutting head 43 is at least equal to the cutting opening width W in the outer cannula 13. The slot 40 that defines the hinge segment 41 extends through about 90% of the inner cannula diameter. Thus, the arc hinge segment 41 subtends an angle of about 70°–80° with a chord length of about ½ the diameter $D_2$. The hinge segment 41 has a length H which is

6

preferably about one fourth the diameter $D_2$ of the inner cannula 20. The length H of the hinge segment 41 must be long enough to permit pivoting of the cutting head 43 in the direction P as the tissue is cut, yet strong enough to withstand cyclic bending as the cutter is used. In one specific embodiment, the length H of the hinge segment 41 is about 0.75 mm for a cutter driven by a motor capable of operation at speeds ranging between 15 to 250 strokes per second. The hinge will flex twice for each cycle as the cutting head pivots up to cut and back down on the return stroke. The arc configuration of the hinge segment 41 increases its stiffness fatigue capability.

An alternative embodiment of the surgical cutting instrument of the present invention is shown in FIGS. 5 and 6. In this embodiment, an outer cannula 50 is provided which is substantially similar in construction to the outer cannula 13 previously described. Likewise, a hand piece 52 is provided for supporting the outer cannula. The inner cannula 55 of this embodiment is modified somewhat from the previous embodiment. This configuration includes a cutting head 56 which is sized and shaped similar to the cutting head 43 of the embodiment in FIGS. 2 and 3. With this inner cannula 55, however, the hinge segment is extended through most of the length of the inner cannula to define a body portion 58. Specifically, the body portion is defined by an arc segment from a tubular form, preferably subtending an angle of about 70°–80°. This body portion 58 is engaged to a drive mount 60 which is itself engaged to a drive rod 61 to provide an axial reciprocating movement to the cutting head 56. The hand piece 52 defines an aspiration chamber 65 which is connected by an aspiration tube 68 to a vacuum source. The aspiration chamber 65 open directly to the interior of the outer cannula, thereby providing a greater aspiration flow path.

In this embodiment, it can be seen that the inner cannula 55 includes a full cylindrical segment only at the cutting head 56. Thus, the cutting head 56 will exhibit the same pivoting aspect about the body portion 58 as with the previous embodiment. However, the reduced profile of the inner cannula throughout most of its length, achieved by the arc form of the body portion 58, reduces the sliding friction between the inner cannula 55 and the outer cannula 50. This embodiment retains the benefit of pivoting the cutting edge of the cutting head into a zero clearance with the cutting opening of the outer cannula 50 as the tissue is being excised. One further advantage is that a smaller motor can be used to drive the entire cutting assembly. This specific embodiment is preferably reserved for less rigorous tissue.

An inner cutting member 70 of an alternative embodiment of the invention is shown in FIGS. 7 and 8. It is understood that this cutting member 70 is reciprocatingly disposed within an outer cannula such as cannula 13, in a manner similar to the previous embodiments. The cutting member 70 is similar to the member 20 shown in FIG. 4. For example, the inner cutting member 70, or inner cannula, includes a cutting head 72 with a cutting edge 73. The cutting head 72 is formed by the provision of a circumferential slot 75 defined in the cutting member 70. The slot further forms a hinge segment 76 so that the cutting head 72 is capable of the same hinged cutting performance as the previous embodiments.

The present embodiment, however, contemplates the addition of a longitudinal slot 78 in the cutting head 72. Specifically, the longitudinal slot 78 extends from the cutting edge 73 to the circumferential hinge slot 75. The slot 78 is preferably, but not necessarily, defined parallel to the longitudinal axis of the inner cutting cannula 70. The longitu-

5,782,849

| 7 | 8 |

dinal slot 78 permits circumferential expansion or contraction of the cutting head 72. Circumferential expansion further ensures a zero clearance between the cutting edge 73 and the cutting opening of the outer cannula. Circumferential contraction on the return stroke of the inner cannula 70 reduces the sliding friction between the inner and outer members.

In one aspect, the circumferential expansion of the cutting head 72 occurs during the cutting stroke. As the cutting head encounters resistance from the tissue extending through the outer cannula cutting opening, the head pivots upward about the hinge segment 76. It is further contemplated that the longitudinal slot 78 can widen against the resistance of the tissue, thereby allowing the cutting head to circumferentially expand against the outer cannula. Alternatively, the cutting head 72 can be preformed so that the cutting head is expanded into contact with the outer cannula when the cutting instrument is assembled. For a variety of reasons it is either difficult or undesirable to use an inner cannula having an outer diameter that is exactly equal to the inner diameter of the outer cannula. Manufacturing tolerances dictate that the nominal diameter of the inner cannula be less than the inner diameter of the outer cannula. Moreover, a smooth sliding fit between the two cannulae further requires some clearance between the two components. These same considerations, however, decrease the cutting efficiency of the cutting edge of the inner cannula against the cutting opening of the outer cannula. The longitudinal slot 78 can be preformed with the slot expanded so that the cutting head has a diameter greater than that of the rest of the inner cutting cannula. This further ensures a zero clearance at the cutting interface between inner and outer cutting edges.

While the invention has been illustrated and described in detail in the drawings and foregoing description, the same is to be considered as illustrative and not restrictive in character, it being understood that only the preferred embodiments have been shown and described and that all changes and modifications that come within the spirit of the invention are desired to be protected. This invention contemplates a reciprocating cutter having a hinged cutting head portion. While the preferred embodiments encompass an inner cannula constructed with the hinge integrally formed between the cutting head and the body of the cannula, alternative hinge constructions are contemplated. For example, the cutting head portion may be separate from the body of the inner cannula with a hinge connecting the two parts.

What is claimed is:

1. A surgical cutting instrument for use in cutting tissue within an anatomical space, comprising:

an outer tubular member sized for percutaneous insertion into the anatomical space, said outer tubular member defining a central bore along the length of said outer tubular member and having a proximal end and a distal end, said outer tubular member further defining a cutting opening having a first cutting edge adjacent said distal end and sized to receive tissue therethrough, said cutting opening having a width dimension along the length of said outer tubular member;

a handpiece for supporting said outer tubular member at said proximal end;

a cutting member for slidably disposed within said central bore of said outer tubular member, said cutting member including;

a tubular cutting head portion defining an end opening and a second cutting edge at said end opening, said

cutting head portion having a length dimension along the length of said cutting member that is at least equal to said width dimension of said cutting opening;

a tubular body portion extending through said central bore from a distal end adjacent said cutting head portion to a proximal end adjacent said cutting handpiece, wherein said head portion and said body portion have substantially the same outer diameter, which outer diameter is sized relative to the inner diameter of said outer tubular member to provide a close running fit; and

a hinge portion connecting said cutting head portion with said body portion to permit pivoting of said cutting head portion relative to said body portion; and

connecting means within said handpiece for connecting said body portion of said cutting member to a source of reciprocating motion to reciprocate said cutting member within said outer tubular member so said second cutting edge traverses said first cutting edge,

wherein said cutting opening has a transverse dimension along the circumference of said outer tubular member sized to permit said cutting head portion pivoting about said hinge portion at least partially into said cutting opening when said cutting head contacts tissue within said outer tubular member to form an essentially zero clearance between said second cutting edge and said first cutting edge as said cutting member is advanced toward said distal end of said outer tubular member.

2. The surgical cutting instrument according to claim 1, wherein:

said cutting member is tubular;

said body portion and said cutting head portion are integral; and

said hinge portion includes a diametrical slot defined in said tubular cutting member to form a hinge segment connecting said body portion and said cutting head portion, said hinge segment defining an arc segment from a tubular form.

3. The surgical cutting instrument according to claim 2, wherein said diametrical slot extends through about 90% (ninety percent) of the diameter of said cutting cutting member.

4. The surgical cutting instrument according to claim 2, wherein said hinge segment subtends an arc angle of between 70 degrees and 80 degrees (70°–80°).

5. The surgical cutting instrument according to claim 2, wherein said hinge segment has a length dimension about one-fourth (¼) the diameter of said tubular cutting head.

6. The surgical cutting instrument according to claim 2, wherein said cutting head defines a slot extending across said cutting head from said second cutting edge to said diametrical slot.

7. The surgical cutting instrument according to claim 1, wherein:

said cutting member is tubular and defines an aspiration passageway therethrough from said cutting head portion to said proximal end; and

said handpiece includes means for engaging a vacuum source for providing aspiration through said aspiration passageway or said cutting member.

8. The surgical cutting instrument according to claim 7, wherein:

said cutting head portion, said body portion and said hinge portion are integral; and

5,782,849

9

said cutting head defines a slot extending across said cutting head from said second cutting edge to said hinge portion.

9. A surgical cutting instrument for use in cutting tissue within an anatomical space, comprising:

an outer tubular member sized for percutaneous insertion into the anatomical space, said outer tubular member defining a central bore along the length of said outer tubular member and having a proximal end and a distal end, said outer tubular member further defining a cutting opening having a first cutting edge adjacent said distal end and sized to receive tissue therethrough, said cutting opening having a width dimension along the length of said outer tubular member;

a handpiece for supporting said outer tubular member at said proximal end;

a cutting member slidably disposed within said central bore of said outer tubular member, said cutting member including;

a tubular cutting head portion defining an end opening and a second cutting edge at said end opening, said cutting head portion have a length dimension along the length of said cutting member that is at least equal to said width dimension of said cutting opening and an outer diameter sized relative to the inner diameter of said outer tubular member to provide a close running fit; and

a body portion extending through said central bore from a distal end adjacent said cutting head portion to a proximal end adjacent said handpiece; and

10

connecting means within said handpiece for connecting said body portion of said cutting member to a source of reciprocating motion to reciprocate said cutting member within said outer tubular member so said second cutting edge traverses said first cutting edge.

wherein said cutting head portion and said body portion are integrally formed;

said body portion is defined by an arc segment of less than 180° from a tubular form extending between said cutting head portion and said connecting means, said body portion includes a hinge portion adjacent said cutting head portion, and

further wherein said cutting head portion pivots about said hinge portion toward said cutting opening when said cutting head contacts tissue within said outer tubular member to form an essentially zero clearance between said second cutting edge and said first cutting edge as said cutting member is advanced toward said distal end of said outer tubular member.

10. The surgical cutting instrument according to claim 9, wherein said body portion subtends an arc angle of between 70 degrees and 80 degrees (70°–80°).

11. The surgical cutting instrument according to claim 9, wherein said cutting head defines a slot extending across said cutting head from said second cutting edge to said hinge portion.

* * * * *

# Exhibit   C

www.patentclaim.com/Patent_Claim/About_GPCI/

(last visited August 31, 2005)



# GENERAL PATENT
### CORPORATION INTERNATIONAL



**Site Navigation**     • **Home**

**Intellectual Property
Enforcement Services**

**About Us**

**Contact Us**

**Intellectual Property
Resources**

**Our e-Newsletter**

**Patents in the News**

**Legal**



Search:
[                    ] [Go]

**Our Clients**
**Media Coverage**
**General Patent
Corporation Intl. Press
Kit**
 **- Press Releases**
 **- Management Team**
  ● Neil G. Cohen
  ● Alexander I.
Poltorak
  ● Paul J. Lerner
**Employment
Opportunities**
**Articles on Patents and
Intellectual Property
Law**

■  **History of General
    Patent Corporation
    International**

■  **Contact General
    Patent Corporation
    International**

■  **Directions to GPCI**

■  **General Patent
    Corporation
    International's Vision
    Statement**

■  **Our Mission**

**Newsletter**
To receive our free
newsletter enter your
email address below:
[                ] [Go]

## About General Patent Corporation International

**"Perhaps the oldest and most successful of these [patent firms] is General Patent Corp., Suffern, NY." — *IEEE Spectrum*, June 2004.**

General Patent Corporation International (GPCI) is a premier intellectual property enforcement firm.  GPCI represents clients in IP enforcement matters and licensing transactions on a contingency basis.   Our company has extensive experience in the area of patent enforcement, and our team of seasoned professionals includes experts in IP law, finance, business and technology, with practical experience in a broad range of industrial research fields.

We have successfully enforced our clients' patents against IBM, Motorola, 3COM, Xircom and many others, achieving generous settlements and licensing agreements for our clients.  Our patent, copyright and trademark enforcement services are offered on a contingency basis, with no up-front cost to the client.

Please see our Criteria for Proposals page to learn more about how to get your IP enforcement campaign underway.

**Related Sites**

**IP Holdings LLC**

**General Patent Corp.**

**Acticon Technologies**

**\*Note: GPCI is not a law firm, and we do not offer legal advice or provide legal services. We also do not file or prosecute patent applications. If you have an idea you'd like to patent, please contact a patent attorney or agent in your area.**

Copyright © 1999-2003 General Patent Corporation

# Exhibit   D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SCIERAN TECHNOLOGIES, INC.,          )
a California corporation,            )
                                     )
                  Plaintiff          )
                                     )  Civil Action No.: 04-1319 (SLR)
          v.                         )
                                     )
BAUSCH & LOMB INCORPORATED,          )
a Delaware corporation,              )
                                     )
                  Defendant          )

**PLAINTIFF SCIERAN TECHNOLOGIES, INC.'S RESPONSE TO DEFENDANT**

**BAUSCH & LOMB INC.'S SECOND SET OF INTERROGATORIES**

PROPOUNDING PARTY: Defendant Bausch & Lomb Incorporated

RESPONDING PARTY: Plaintiff Scieran Technologies, Inc.


Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Scieran Technologies, Inc. ("Scieran") hereby responds to the Second Set of Interrogatories propounded by Defendant Bausch & Lomb Incorporated ("Bausch & Lomb") as set forth below. Scieran's responses and answers are made without waiving or intending to waive any objections as to relevancy, privilege, admissibility of any information provided in response or answers to the Interrogatories, in any subsequent proceeding or at trial of this or any other action, on any ground. A partial response or answer to any Interrogatory which has been objected to, in whole or in part, is not intended to be a waiver of the objection.


**GENERAL OBJECTIONS**

Scieran makes the following General Objections to Bausch & Lomb's Interrogatories:

The subject matter of the proposed agreement, however, was limited to U.S. Pat. Nos. 4,911,161 and 5,403,276 to Alan Schechter and pending applications, none of which disclosed the inventions of the claims of the patents-in-suit. The Examiners of the patents-in-suit did not disagree. In fact, U.S. Pat. No. 5,403,276 was actually reviewed by the Examiners and distinguished. So was U.S. Pat. No. 5,782,849 to Mr. Miller of Promex as the face page and file history of the earliest of the patents-in-suit shows. Scieran's inventions respecting many of its efforts on Scieran's Vit Commander are set forth in the patents-in-suit, U.S. Pat. Nos. 6,258,111 and 6,629,986 to Scieran.

Moreover, Scieran never saw the particular structure of the cutting tip of the Noetix/Promex Vit Commander System. Scieran did not derive the inventions of the patents-in-suit from anyone. Defendant's assertion of invalidity under 35 U.S.C. § 102(f) fails.

Any disclosure by Scieran, or others, of the Noetix/Promex Vit Commander System as part of Scieran's marketing efforts or otherwise Plaintiff believes is not relevant because Plaintiff believes that that system did not include invalidating prior art of the patents-in-suit under 35 U.S.C. § 102(b) or any other U.S. patent law. The assertions and documents, many of which are undated, referenced by Defendant in its response do not convince Plaintiff otherwise. Moreover, Plaintiff contends that any purported invention by others of the inventions of the asserted claims, if inventions at all, were abandoned, concealed or suppressed within the meaning of 35 U.S.C. § 102(g).

The Alleged Storz MicroVit

In its response, Defendant asserts that claims 1-4 of the '986 are invalid under 35 U.S.C. § 102(b) because of Storz' sales of that product since "at least 1993." Defendant, however, does not indicate which year such Storz sales actually began. The term "at least" renders this assertion vague, ambiguous, and indefinite. Additionally, in its response, Defendant, which purchased Storz many years ago, did not reference any documents that depict the alleged prior art product. Moreover, Defendant's assertion of the existence of a flared tip does not comport with a preexisting bend and Defendant presents no evidence that the alleged flare creates a spring

5

Defendant contends that Figure 6 fails to show a pre-bent tip. Defendant does not contend that Figure 6 fails to show a circumferential slit. Defendant admits that Figures 27-29 disclose an inner sleeve having a pre-bent tip. It is clear to Plaintiff that Figure 6 of the '111 patent discloses an inner cannula having a circumferential slit and a pre-bent tip. Additionally, Claim 3 itself discloses an inner cannula having a circumferential slit and a pre-bent tip. The two Examiners during the prosecution of the '111 patent did not conclude that Claim 3 was not supported by the specification. And Section 112 does not require that a single figure show each and every element of a claim. Defendant does not contend otherwise. Defendant's response fails to show that the written description is inadequate.

INTERROGATORY NO. 13

State everything that Mr. Ross, or others at Scieran, knew about the structure of the prototype cutters Dr. Schechter provided to him in *1995,* and identify each person with knowledge of that information and each document relating thereto.

RESPONSE TO INTERROGATORY NO. 13

Plaintiff objects to this Interrogatory to the extent that it is overly broad, not relevant, and not likely to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that the Interrogatory is unduly burdensome and oppressive in that it seeks a narrative and that there are alternative discovery devices more suitable to such inquiry.

Subject to and without waiving any of the aforesaid objections, Plaintiff responds as follows: Plaintiff was unaware of the particular structure of the inner cannula of the Vit Commander System developed by Noetix/Promex.

INTERROGATORY NO. 14

Identify all documents and facts showing the origination and development of the "alternate embodiment" of Figure 6 in U.S. Patent Application No. 08/739,640, identify all documents and facts leading to the inclusion of that embodiment in that application on October

12

are alternative discovery devices more suitable to such inquiry.    Plaintiff also objects to this Interrogatory to the extent that it seeks legal conclusions and that it seeks information subject to attorney work product protection.    Plaintiff also objects to this Interrogatory to the extent that it exceeds the maximum of 25 in number in violation of the Court's Scheduling Order.

Dated: June 6, 2005

As to objections and legal analysis,
O'CONNOR CHRISTENSEN & McLAUGHLIN, LLP

Edward F. O'Connor
Becky V. Christensen
Craig McLaughlin
1920 Main Street, Suite 150
Irvine, California 92614
(949) 851-5000
(949) 851-5051 fax

Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6672
Attorneys for Scieran Technologies, Inc.

14

## VERIFICATION

I, Rod Ross, am President of Scieran Technologies, Inc., Plaintiff in the matter of *Scieran Technologies, Inc. v. Bausch & Lomb Incorporated*, in the U.S. District Court for the District of Delaware, Case No. C.A. No. 04-1319 (SLR). The matters stated in the foregoing Response to Defendant Bausch & Lomb's Second Set of Interrogatories to Scieran Technologies are true of my own knowledge except as to those matters which are stated on information and belief.

I declare under penalty of perjury under that the foregoing is true correct.

Executed on June 6, 2005 in _Laguna Hills_, California.

Rod Ross, President,
Scieran Technologies, Inc.

Exhibit    E

# CONFIDENTIAL

# EXHIBIT

# Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MEDTRONIC INC.,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )   Civ. No. 03-848-SLR
                                   )
GUIDANT CORPORATION, GUIDANT       )
SALES CORPORATION, ELI             )
LILLY & COMPANY, MIROWSKI          )
FAMILY VENTURES L.L.C.,            )
                                   )
          Defendants.              )


**MEMORANDUM ORDER**

     At Wilmington this ϑϭ day of October, 2004, having

reviewed <u>in camera</u> all of the documents scheduled on defendants'

supplemental privilege log;

     IT IS ORDERED that, on or before October 27, 2004,

defendants shall produce all the documents listed on their

supplemental privilege log (**except** P8, P63, P68, P69, P88, P91-

P94) for the following reasons:

     1.   On August 29, 2003, plaintiff Medtronic Inc. filed

this action for declaratory judgment of patent infringement

against defendants Guidant Corp., Guidant Sales Corp., Eli Lilly

& Co. and Mirowski Family Ventures.  (D.I. 1)  The patent at

issue is U.S. Patent No. RE38, 119 E (the "'119 patent").  <u>Id.</u>

The '119 patent is a "broadening reissue" of U.S. Patent No.

4,928,688 (the "'688 patent").  (<u>Id.</u>)  On April 21, 2004, this

court denied plaintiff's motion to compel discovery of documents concerning communications between the inventor and his attorney during prosecution of the '688 patent.  (D.I. 59)  On August 20, 2004, the defendants produced a supplemental privilege log that re-described some of the documents in question.  (D.I. 91 at 15-16)  On October 6, 2004, this court granted plaintiff's motion in limine no. 2 to preclude defendants from relying on attorney error to support the validity of the claims of the '119 patent, pending in camera review of all documents scheduled on defendants' privilege log that relate to prosecution and issuance of the '688 and '119 patents.  (D.I. 105)  On October 13, 2004, defendants submitted these documents for in camera review.

      2.   In its denial of plaintiff's motion to compel, this court stated that it would reconsider disclosure of the documents at issue, as the litigation proceeded, if plaintiff provided further objective evidence that privilege had been waived because the documents in question fell within the "objective indicia of [bad] intent" exception.  (D.I. 59 at ¶¶ 3, 6)

      3.   Defendants' supplemental privilege log constitutes such objective evidence.  In his declaration, the inventor of the '119 patent, Morton Mower, stated that the first patent application was inadequate because there was a "lack of adequate communication between Mr. Nikolai, [the principle patent attorney

involved in prosecution], and [Mr. Mower]" and he "was not kept advised of the progress of [his] application." (D.I. 93 at Ex. 2, ¶¶ 8, 9)  The supplemental privilege log indicates there were such communications.  In light of this evidence, the court reviewed the documents <u>in camera</u>.

4.    After reviewing the documents <u>in camera</u>, the court has concluded that defendants are using the attorney-client privilege as both a sword and a shield.  Therefore, the privilege is deemed waived and the relevant documents shall be produced if defendants continue to rely on attorney error as the basis for the broadening reissue.

_____
United States District Judge

3

# Exhibit   G



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

### C.A. # 04-1319 (SLR)

---

Transcript of:

Greggory W. Hughes

July 28, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Scieran Technologies, Inc.                                                      Bausch & Lomb, Incorporated
Greggory W. Hughes                          v.                                                July 28, 2005
                                        C.A. # 04-1319 (SLR)

Page 22

1    A.  Yes.

2    Q.  And what topics do you understand you're

3    testifying about?

4    A.  I believe it's 1 through 4.

5    Q.  If you look at the second notice, do you

6    understand that you have been designated to testify about

7    paragraphs 3 and 5?

8    A.  Okay.

9    Q.  You do understand that, don't you?

10   A.  I was aware of 1 through 4, but these fall

11   within my knowledge.

12   Q.  What have you done to prepare for your

13   deposition?

14   A.  Very little.

15   Q.  Excuse me?

16   A.  Very little.

17   Q.  Why don't you tell me what you did do other than

18   very little.

19   A.  Other than recollect dates like you're talking,

20   appointment dates, that type of thing, I don't recall how

21   the cutter design was developed and processed.

22   Q.  Did you review documents?

23   A.  My own drawings, yes.

24   Q.  Did you review anything other than your own

Page 23

1    drawings?

2    A.  No.

3    Q.  Did you talk to anyone else about the work that

4    was done in developing the inventions of the patents?

5    A.  Only Chris Ross — I'm sorry. Rod Ross and

6    Chris Boore.

7    Q.  When did you talk to Mr. Ross and Mr. Boore?

8    A.  Ever since this case started.

9    Q.  Well, did you have specific discussions with

10   them in preparation for this deposition?

11   A.  Only, like I say, trying to recollect the events

12   that occurred 10 years ago.

13   Q.  When did you talk to them about that?

14   A.  I have been talking to them ever since the case

15   started.

16   Q.  What did you discuss with Mr. Ross and Mr. Boore

17   on those topics?

18       MR. McLAUGHLIN:  Objection.  Narrative.

19   A.  All I would do is just recollect out loud what I

20   remember and see if they concurred, and they would do the

21   same to me.

22   Q.  Were there discrepancies between what you

23   remembered and what Mr. Ross or Mr. Boore remembered?

24   A.  No.

Page 24

1    Q.  No?

2    A.  No.

3    Q.  Did you discuss, since this case has started

4    with Mr. Ross or Mr. Boore, what they knew about the

5    structure of the Noetix vitrectomy device?

6    A.  Did I talk to them about it?

7    Q.  Yes.

8    A.  The only thing they ever said is that there's no

9    way they could — they didn't know and there's no way

10   they could have known.

11   Q.  Have you ever had any communication, either

12   verbally or in writing, with Mr. Ross about what he knew

13   about the structure of the Noetix vitrectomy device?

14   A.  Only like I just said, only our discussions

15   about — only during our discussions about our

16   recollection of our device did he ever mention that he

17   mentioned in the court case that they were implying that

18   he knew something about it, and he said he didn't and

19   there's no way he could have.

20   Q.  He told you that he didn't know anything about

21   the structure?

22   A.  Right.

23   Q.  Did you ever discuss with Mr. Lerner the

24   structure of the Noetix device?

Page 25

1    A.  No.

2    Q.  Did you ever see any documents where Mr. Ross

3    described anything he knew about the structure of the

4    Noetix device?

5    A.  No.

6    Q.  In connection with this litigation, have you

7    learned anything about the structure of the Noetix

8    vitrectomy device?

9       MR. McLAUGHLIN:  Objection.  You can answer

10   that in more detail only to the extent that you didn't

11   uncover that information from one of your attorneys.

12   BY MR. BLUMENFELD:

13   Q.  What did you learn about the structure of the

14   Noetix device?

15   A.  That it has a slitted cannula.

16   Q.  Who did you learn that from?

17   A.  I don't know exactly.  It just came out in this

18   case.

19   Q.  Do you remember when you learned about it?

20   A.  Somewhere in the beginning of the case.

21   Q.  Did you learn that before the case was even

22   filed?

23   A.  No.

24   Q.  Did you have any role in the decision to bring

7 (Pages 22 to 25)

Exhibit   H



## WILCOX & FETZER LTD.

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

### C.A. # 04-1319 SLR

---

Transcript of:

Rodney L. Ross

## August 11, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Page 46

1    Q.  But I'm not asking you to talk to him.  I'm just
2    saying:  As you sit here now, is there any reason you
3    know of why you wouldn't be willing to do that?
4    A.  None that I know of.
5    Q.  Who made the decision to file this lawsuit
6    against Bausch & Lomb?
7              MR. McLAUGHLIN:  Objection, to the extent
8    it calls for attorney/client communications.
9              If somebody other than your attorneys
10   helped you with that decision, go ahead and answer.
11   A.  I consulted with a number of people.
12   Q.  Who made the decision?
13             MR. McLAUGHLIN:  Same objection.
14   A.  Ultimately I made the decision.
15   Q.  And when did you make that decision?
16   A.  Several years ago.
17   Q.  And how many years ago?
18   A.  Well, once I saw the B & L cutters and had
19   several attorneys look at it, then I thought it should be
20   pursued.
21   Q.  And that was in 2000 or 2001?
22   A.  I don't recall when that was.
23   Q.  But it was several years ago?
24   A.  Yeah.

Page 47

1    Q.  And why did you wait until September of 2004 to
2    file the lawsuit?
3    A.  I had many other things going on.
4    Q.  And what types of other things did you have
5    going on?
6    A.  All these other businesses.
7    Q.  And it was managing those other businesses that
8    prevented you from filing the lawsuit earlier?
9    A.  And I met with a number of attorneys.  I wanted
10   to get a number of opinions.
11   Q.  How many attorneys did you talk to who turned
12   you down on this lawsuit?
13             MR. McLAUGHLIN:  Objection, to the extent
14   it calls for attorney/client communications.
15             Instruct you not to answer that question.
16   BY MR. BLUMENFELD:
17   Q.  Are you going to follow your attorney's advice?
18   A.  Yes.
19   Q.  But you met with a number of attorneys the last
20   several years --
21   A.  Yes.
22   Q.  -- about suing Bausch & Lomb?
23   A.  Correct.
24   Q.  And over the last several years after you made

Page 18

1    the decision to sue Bausch & Lomb, tell me all of the
2    steps that you took to preserve Scieran's documents.
3    A.  I'm not sure what you mean.
4    Q.  Well, you told me a little earlier that
5    approximately 75 percent of Scieran's documents that
6    existed in late 2000 or early 2001 had been destroyed,
7    and you just told me that you made the decision to sue
8    Bausch & Lomb several years ago, and I just wanted to
9    know what steps you took after you made the decision that
10   you were going to sue Bausch & Lomb to preserve Scieran's
11   documents for the litigation.
12   A.  I just tried to save as many documents as I
13   could.
14   Q.  Well, if you tried to save as many documents as
15   you could, how is it that 75 percent of Scieran's
16   documents were destroyed?
17             MR. McLAUGHLIN:  Objection.  Argumentative.
18   A.  I saved as many documents as I could -- as I had
19   space for.
20   Q.  So the documents that you didn't have space for
21   were destroyed; is that right?
22   A.  Correct.
23   Q.  And you didn't file the litigation earlier
24   because you were busy managing your other businesses; is

Page 49

1    that correct?
2    A.  That's part of it.
3    Q.  And you knew during the last several years that
4    Bausch & Lomb was continuing to sell the device that
5    you're accusing of infringement, right?
6    A.  That's correct.
7    Q.  When was the Vit Commander on the market?
8    A.  I think we introduced it in '97, and it was
9    available through 2000 and 2001.
10   Q.  And approximately what was the volume of the
11   sales of the Vit Commander during the time it was on the
12   market?
13   A.  I don't recall the total.  It's in the sales
14   documents we provided.
15   Q.  Was it, in your view, a successful product?
16   A.  I think performance-wise it was.
17   Q.  How about from a financial point of view?
18   A.  I think it could have been better.
19   Q.  Did you make any money on it?
20   A.  No.
21   Q.  Why not?
22   A.  It's a competitive market.
23   Q.  Did you try to find partners who would help you
24   market the Vit Commander?

13 (Pages 46 to 49)

Scieran Technologies, Inc.                    v.                    Bausch & Lomb, Incorporated
Rodney L. Ross                         C.A. # 04-1319 SLR                      August 11, 2005

Page 166

1    Q.   Do you know whether this was actually sent out?
2    A.   I don't recall, but there's a chance it was. I
3    don't recall this marketing piece.
4    Q.   Do you remember other versions or issues of the
5    Vit Commander report that were sent out by Scieran?
6    A.   No, not off the top of my head. No, I'm sorry.
7    Q.   This was produced to us by Promex. Do you know
8    what happened to Scieran's copies of this or other issues
9    of the Vit Commander report?
10   A.   No, I'm afraid I don't.
11   Q.   Do you think maybe they were in the documents
12   that were disposed of a few years ago?
13   A.   It's very possible.
14   Q.   Did you supply the Patent Office with a copy of
15   Defendant's Exhibit 23 during the prosecution of the
16   patent application?
17   A.   That I don't recall, either.
18   Q.   You don't recall whether you did or you didn't?
19   A.   I don't recall if we did or didn't.
20   Q.   Let me show you what's been previously marked as
21   Defendant's Exhibit 18. It's a letter dated May 3, 1995,
22   from Bradley Nemeth to Alan Schechter. Who is
23   Mr. Nemeth?
24   A.   Mr. Nemeth is an attorney in San Diego who I

Page 167

1    think was a contact of Chris Boore, and we got Mr. Nemeth
2    to help us file the incorporated papers and get the
3    company started.
4    Q.   Does he still do work for Scieran?
5    A.   Yes.
6    Q.   Now, when Mr. Nemeth had communications with
7    Mr. Schechter or with others at Noetix, did he provide
8    you with copies?
9    A.   Yes, I think he did.
10   Q.   So would you have gotten a copy of this letter?
11   A.   Yes, I believe so.
12   Q.   And this was a copy produced by Promex. Do you
13   know what happened to Scieran's copy of it?
14   A.   No, I do not.
15   Q.   You think maybe it was disposed of a few years
16   ago when you were disposing of documents?
17   A.   It could have accidentally got lost in those
18   that I discarded.
19   Q.   I want to ask you about the paragraph at the top
20   of the second page, Mr. Ross.
21   A.   Okay.
22   Q.   Mr. Nemeth was writing to Mr. Schechter, right?
23   A.   Uh-huh.
24   Q.   And he was writing on behalf of Scieran?

Page 168

1    A.   Right.
2    Q.   And he said, "On January 18, 1995, you sent a
3    letter to me enclosing information concerning the cutter
4    and patents, along with technical specifications."
5         Did Mr. Nemeth send you a copy of that
6    letter enclosing information concerning the cutter and
7    patents along with technical specifications?
8    A.   He may have, but I don't recall it.
9    Q.   And, in fact, you know from reading the next
10   sentence that he did send it to you, right?
11   A.   Yes, he must have.
12   Q.   Because it was used to prepare Scieran's
13   business plan.
14   A.   Uh-huh.
15   Q.   Where is that information concerning the cutter
16   and patents along with the technical specifications?
17   A.   I don't know.
18   Q.   Do you think that was more information that you
19   discarded a few years ago?
20   A.   It's possible.
21   Q.   Sitting here today, do you know what the
22   technical specifications and the information on the
23   cutter and patents was?
24   A.   No, I don't recall. I would assume it to be the

Page 169

1    Schechter patents.
2    Q.   And the cutter -- the information concerning the
3    cutter along with technical specifications, what would
4    that be?
5    A.   Well, some of the technical specifications we
6    would have spoken with Mr. Schechter about would have to
7    be with cut speed, aspiration port location, things of
8    that nature.
9    Q.   But whatever information he provided you on
10   January 18th, 1995, about the cutter, as far as you know,
11   no longer exists, right?
12   A.   It's not in my possession.
13        MR. BLUMENFELD:  Why don't we try to call
14   the Judge again, unless you don't want to.
15        MR. McLAUGHLIN:  I guess what you want to
16   get from me, apparently, is an agreement to not talk to
17   the witness about the subject matter of the deposition,
18   whether or not it's in preparation or any other aspect.
19   And then it sounds like what you want to do is to go on
20   once you get that agreement and go on and ask the witness
21   to disclose attorney/client information based on earlier
22   conversations.
23        Am I on track?
24        MR. BLUMENFELD:  Well, I certainly want you

43 (Pages 166 to 169)