IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SCIERAN TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-1319 (SLR) |
| ) | |
| BAUSCH & LOMB INCORPORATED, ) | |
| ) | |
| Defendant. ) | |

**BAUSCH & LOMB'S REPLY IN SUPPORT
OF ITS APPLICATION FOR *IN CAMERA* INSPECTION**

In its application (D.I. 70), Bausch & Lomb ("B&L") asserted that Scieran's president, Rod Ross, gave testimony at his August 2005 deposition contrary to what he said in an earlier email to Paul Lerner of General Patent Corporation International ("GPCI") in July 2004. Specifically, although Mr. Ross acknowledged in his email that Dr. Schechter had told him about the design of the Noetix prototype vitrectomy device (as he also said at an April 2005 meeting), he then testified in this action that Dr. Schechter did not tell him "anything" about that design. Scieran cannot and does not deny that Mr. Ross' testimony is contradicted by his earlier email.[1]

B&L also pointed out that Mr. Ross destroyed other documents that might have contradicted his testimony after he knew it was likely that Scieran would bring this lawsuit. Scieran cannot and does not deny that either.

B&L also noted that GPCI "is not a law firm and [does] not offer legal advice or provide legal services." Scieran cannot and does not deny that either. Nevertheless, Scieran's sole basis for its assertion of privilege is that GPCI's Mr. Lerner was acting as Scieran's lawyer in 2004 and he "consider[s]" the email privileged. (D.I. 76, Ex. 2, Lerner Decl. ¶7). Mr. Lerner does not even try to explain, however, how Mr. Ross' email meets the legal requirements for

---

[1] Scieran "inadvertently" produced the email to B&L a second time with its Opposition, then again demanded its destruction.

privilege. He just asserts that he considers it privileged. Nor does he even try to square his position with the announcement on GPCI's website that it does not provide legal services.

Perhaps most importantly, Scieran -- the client and the holder of any privilege -- does nothing to support a claim of privilege. The author of the email, Mr. Ross, is silent both about Scieran's relationship with Mr. Lerner and GPCI and about the email. Nowhere does Mr. Ross provide any factual basis to assert that the email was privileged. Indeed, he could not do so because Scieran's counsel directed him at his deposition not to disclose the nature of Scieran's relationship with GPCI (Ex. A, Ross Tr. at 13-14). Scieran has also refused to produce its agreement with GPCI. Thus, the only record evidence is that GPCI does not provide legal services (D.I. 70, Ex. C).

In fact, the withheld email sets forth only facts that Mr. Ross knew. Scieran has not established that there is anything privileged about those facts. *See Rhone-Poulenc Rorer Inc. v. The Home Indemnity Co.*, 32 F.3d 851, 862, 864 (3d Cir. 1994). Even if it had, for the reasons stated in B&L's application, it would be manifestly unfair to permit Scieran to offer Mr. Ross' current version of the facts, but to withhold his earlier, contradictory version.[2]

Finally, Scieran argues that Irell 147 is not relevant. That is unfounded. Mr. Ross included in his patent application a device that had been brought to him by Noetix, and claimed that he was the inventor of that device. In other words, he claimed that he invented something he did not. Mr. Ross now claims that he did not know the structure of the Noetix device, when Irell 147 shows that he did and thus that he knew the invention was not his when he filed the patent

---

[2] Scieran's lawyers ignore their obligation to correct the record if they learn of false testimony. Scieran's response also raises another ethical issue. Scieran argues that the copy recipient of the email, Mr. Hughes, has a common interest because "he has a stake in the outcome of the litigation" (D.I. 76 at 2). Mr. Hughes' "stake" is what he characterized as a "contingency thing" (*id.* at Ex. 3). He testified: "I'll get paid if we win the case. If not, I won't get anything."

application (and when he destroyed Scieran's documents). It is difficult to imagine something more relevant than that to inequitable conduct (or to Mr. Ross' credibility). *See Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 135 (Fed. Cir. 2000) (failure to disclose the identity of others who supplied the named inventors with critical materials and data, and whose work was the genesis of the invention, found to be inequitable conduct).

## CONCLUSION

Scieran should be ordered to produce Irell 147. B&L does not know whether Scieran is withholding other similar documents, because Scieran has refused to provide a privilege log, despite repeated requests. The Court should also order Scieran to provide B&L with a privilege log.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Leslie A. Polizoti

---

Jack B. Blumenfeld (#1014)
Leslie A. Polizoti (#4299)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
  *Attorneys for Defendant*
  *Bausch & Lomb Incorporated*

September 19, 2005

483601

# EXHIBIT A



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

C.A. # 04-1319 SLR

---

Transcript of:

Rodney L. Ross

August 11, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

| Scieran Technologies, Inc.<br>Rodney L. Ross | v.<br>C.A. # 04-1319 SLR | Bausch & Lomb, Incorporated<br>August 11, 2005 |

Page 10

1  week ago?
2  A. He told me that he had completed the depos and
3  he was headed back to California.
4  Q. Did he call you from here in Delaware?
5  A. I'm not sure. I think it was on his cell phone.
6  So I don't know where he was.
7  Q. What did he tell you about the deposition?
8  A. He didn't say much about it at all. He was in a
9  hurry.
10  Q. Have you discussed with Mr. Boore at all what
11  happened at his deposition?
12  A. No, I have not.
13  Q. Have you read the transcript of his deposition?
14  A. Yes, I did.
15  Q. When did you read the transcript?
16  A. Yesterday.
17  Q. Did you see anything in the transcript that you
18  felt was not accurate?
19  A. Nothing that I can think of at this point.
20  Q. How much of the stock of Scieran Technologies do
21  you own?
22  A. I would say approximately 12 percent.
23  Q. And how many shares is that?
24  A. I don't recall.

Page 11

1  Q. And how much does Mr. Boore own?
2  A. I would estimate somewhere in the vicinity of
3  10 percent.
4  Q. Is Gregg Hughes a shareholder of Scieran?
5  A. Yes, he is.
6  Q. And approximately how much of Scieran stock does
7  Mr. Hughes own?
8  A. I would guess that to be around 8 percent.
9  Q. So that's the three of you, that's about
10  30 percent of the stock of Scieran; is that right?
11  A. Yes.
12  Q. Who owns the other 70 percent?
13  A. A variety of other people. Mostly investors.
14  Q. Is that a large number of investors?
15  A. I don't think so. I'm going to estimate it to
16  be around maybe 20 or 25 people.
17  Q. Does Dr. Tornambe own stock in Scieran?
18  A. Yes, he does.
19  Q. Approximately how much does Dr. Tornambe own?
20  A. I don't recall, but I don't think it's very
21  much.
22  Q. How about Dr. McBeath, does he own stock in
23  Scieran?
24  A. He does not.

Page 12

1  Q. Does General Patent own any stock in Scieran?
2  A. They do not.
3  Q. What is Scieran's relationship with General
4  Patent?
5  A. It's a contractual relationship involving this
6  litigation.
7  Q. How did you get into contact with General
8  Patent?
9  A. Through a patent attorney in Orange County.
10  Q. Who was that?
11  A. His name is Mike Shimacagie (phonetic).
12  Q. How do you spell that?
13  A. I have no idea.
14  Q. Can you say it again?
15  A. Shimacagie (phonetic).
16  Q. What is your relationship with Mr. Shimacagie
17  (phonetic)?
18  A. He came to see me one time, just -- I guess he
19  had heard about me through some other contact, and he's a
20  patent attorney, and he just came to see if he could do
21  any patent work for us.
22  Q. And how did he come to put you in touch with
23  General Patent?
24       MR. McLAUGHLIN: I'm going to object. This

Page 13

1  question is attorney/client privilege. And instruct the
2  witness not to answer.
3  BY MR. BLUMENFELD:
4  Q. Is Mr. Shimacagie (phonetic) an attorney for
5  you?
6  A. I have never hired him to do any work.
7  Q. You regard your communications with
8  Mr. Shimacagie (phonetic) as being privileged
9  communications?
10       MR. McLAUGHLIN: Objection, to the extent
11  it calls for a legal conclusion.
12  A. I have shown him some of our documents, yes.
13  Q. You're talking about Scieran documents?
14  A. Yes.
15  Q. Now, do you regard -- do you regard your
16  communications with Mr. Shimacagie (phonetic) as being
17  privileged?
18       MR. McLAUGHLIN: Objection. Asked and
19  answered.
20  A. I do consider it privileged.
21  Q. Now, what is your contractual relationship -- by
22  "you" I mean Scieran. What is Scieran's contractual
23  relationship with General Patent?
24       MR. McLAUGHLIN: Objection, to the extent

4 (Pages 10 to 13)

Page 14

1  it calls for a legal conclusion.
2  A. It's a contract where they assist us in this
3  litigation.
4  Q. And how do they assist you?
5  A. I'd have to go back and read the terms of the
6  agreement.
7  Q. And what does General Patent get in exchange for
8  assisting you in the litigation?
9  A. They get a portion of the settlement.
10 Q. And what portion of the settlement does General
11 Patent get?
12 A. I think it's somewhere around 50 percent.
13 Q. Did you negotiate that?
14 A. Yes.
15 Q. Did you negotiate that with Mr. Lerner?
16 A. I believe so, yes.
17 Q. How did you come up with the 50 percent number?
18 A. I don't know that I did. I think it was an
19 agreement that they had, and I approved it.
20 Q. And you said 50 percent of settlement. What if
21 you litigate the case to a trial, do they also get
22 50 percent of anything that Scieran wins?
23 A. I believe so.
24 Q. Are you paying -- "you" being Scieran -- the

Page 15

1  expenses incurred in connection with this litigation?
2  A. No, we're not.
3  Q. Is General Patent paying the expenses?
4  A. I assume so.
5  Q. What is your relationship with Gregg Hughes?
6  A. Currently?
7  Q. Yes.
8  A. I contract for him to do certain engineering
9  work for a variety of the companies that I manage.
10 Q. Which companies?
11 A. Med-Logics, Enlighten, and VersEye.
12 Q. How long has Mr. Hughes been doing contract work
13 for your companies other than Scieran?
14 A. I would guess since probably the late '90s.
15 Q. Can you estimate how much Mr. Hughes has been
16 paid by companies that you manage since 1995?
17 A. I wouldn't have any idea.
18 Q. Do you have an idea of how much Mr. Hughes is
19 currently getting paid on an annual basis by companies
20 that you manage?
21 A. No. I haven't looked at those figures. I have
22 no idea.
23 Q. Is it your understanding that Mr. Hughes is
24 generating most of his income from consulting for

Page 16

1  companies that you manage?
2  A. I have no idea what other work he does.
3  Q. Well, in 2004, just the most recent calendar
4  year, was Mr. Hughes paid tens of thousands of dollars by
5  companies that you manage?
6  A. It's possible.
7  Q. But you really don't have any idea?
8  A. No. I don't look at those figures. Somebody
9  else does.
10 Q. Who looks at those figures?
11 A. Well, my wife manages that part of some of these
12 businesses. And VersEye, that's managed by one of the
13 vice presidents.
14 Q. What is your wife's name?
15 A. Betty.
16 Q. What, if anything, is your wife's relationship
17 with Scieran?
18 A. None.
19 Q. Was there ever a time when she had a
20 relationship with Scieran?
21 A. She just helped me do a lot of the early
22 accounting and paperwork.
23 Q. Does Scieran have an office?
24 A. No.

Page 17

1  Q. Was there a time when Scieran did have an
2  office?
3  A. Yes, we did.
4  Q. When was that?
5  A. I'd say maybe starting in perhaps '96 through
6  2000 or 2001.
7  Q. And where was Scieran's office?
8  A. In Laguna Hills.
9  Q. Where in Laguna Hills?
10 A. I forget the street address, but it was on Cabot
11 Road. C-a-b-o-t.
12 Q. How big was that office?
13 A. Seemed like it was around 2,500 square feet.
14 Q. Now, before the Laguna Hills office, where was
15 Scieran operated out of?
16 A. Out of our home.
17 Q. Did you have an office in your home?
18 A. Yes.
19 Q. Is that the same home you're living in now?
20 A. No, it's not.
21 Q. Where was that home?
22 A. It was in Laguna Niguel. I forget the street
23 address.
24 Q. And how big was the Scieran office in your home?

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2005, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to Josy W. Ingersoll, Edward O'Connor, Craig McLaughlin, and Becky Christensen.

I also certify that on September 19, 2005, I caused to be served true and correct copies of the foregoing document on the following in the manner indicated below:

**BY HAND**

Josy W. Ingersoll
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

Edward O'Connor
Craig McLaughlin
O'CONNOR CHRISTENSEN & MCLAUGHLIN LLP
1920 Main Street, Suite 150
Irvine, CA 92614

/s/ Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT AND TUNNELL
1201 North Market Street
Wilmington, DE 19801
(302) 658-9200
lpolizoti@mnat.com