# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**SCIERAN TECHNOLOGIES, INC.,**
a California corporation,

     Plaintiff

  v.

**BAUSCH & LOMB INCORPORATED,**
a Delaware corporation,

     Defendant

Civil Action No.: 04-1319 (SLR)

**PLAINTIFF SCIERAN TECHNOLOGIES, INC.'S RESPONSE TO DEFENDANT**

**BAUSCH & LOMB INC.'S SECOND SET OF INTERROGATORIES**

PROPOUNDING PARTY: Defendant Bausch & Lomb Incorporated

RESPONDING PARTY: Plaintiff Scieran Technologies, Inc.

   Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff Scieran Technologies, Inc. ("Scieran") hereby responds to the Second Set of Interrogatories propounded by Defendant Bausch & Lomb Incorporated ("Bausch & Lomb") as set forth below. Scieran's responses and answers are made without waiving or intending to waive any objections as to relevancy, privilege, admissibility of any information provided in response or answers to the Interrogatories, in any subsequent proceeding or at trial of this or any other action, on any ground. A partial response or answer to any Interrogatory which has been objected to, in whole or in part, is not intended to be a waiver of the objection.

## GENERAL OBJECTIONS

   Scieran makes the following General Objections to Bausch & Lomb's Interrogatories:

Defendant contends that Figure 6 fails to show a pre-bent tip. Defendant does not contend that Figure 6 fails to show a circumferential slit. Defendant admits that Figures 27-29 disclose an inner sleeve having a pre-bent tip. It is clear to Plaintiff that Figure 6 of the '111 patent discloses an inner cannula having a circumferential slit and a pre-bent tip. Additionally, Claim 3 itself discloses an inner cannula having a circumferential slit and a pre-bent tip. The two Examiners during the prosecution of the '111 patent did not conclude that Claim 3 was not supported by the specification. And Section 112 does not require that a single figure show each and every element of a claim. Defendant does not contend otherwise. Defendant's response fails to show that the written description is inadequate.

## INTERROGATORY NO. 13

State everything that Mr. Ross, or others at Scieran, knew about the structure of the prototype cutters Dr. Schechter provided to him in *1995,* and identify each person with knowledge of that information and each document relating thereto.

## RESPONSE TO INTERROGATORY NO. 13

Plaintiff objects to this Interrogatory to the extent that it is overly broad, not relevant, and not likely to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that the Interrogatory is unduly burdensome and oppressive in that it seeks a narrative and that there are alternative discovery devices more suitable to such inquiry.

Subject to and without waiving any of the aforesaid objections, Plaintiff responds as follows: Plaintiff was unaware of the particular structure of the inner cannula of the Vit Commander System developed by Noetix/Promex.

## INTERROGATORY NO. 14

Identify all documents and facts showing the origination and development of the "alternate embodiment" of Figure 6 in U.S. Patent Application No. 08/739,640, identify all documents and facts leading to the inclusion of that embodiment in that application on October

12

30, 1996, provide a detailed explanation of why Figure 6 was included in the application, and identify each person with knowledge of the inclusion of Figure 6 or the decision to include Figure 6.

RESPONSE TO INTERROGATORY NO. 14

Plaintiff objects to this Interrogatory to the extent that it is overly broad, not relevant, and not likely to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that the Interrogatory is unduly burdensome and oppressive in that it seeks a narrative and that there are alternative discovery devices more suitable to such inquiry. Plaintiff also objects to this Interrogatory to the extent that it seeks legal conclusions and information subject to attorney work product protection. Plaintiff also objects to this Interrogatory to the extent that it exceeds the maximum of 25 in number in violation of the Court's Scheduling Order.


INTERROGATORY NO. 15

State the reasons that the applicants for the patents-in-suit did not disclose to the United States Patent and Trademark Office during prosecution of the applications that resulted in those patents any of the following facts: (1) the embodiment disclosed in Figure 6 was not invented by the named inventors, (2) the embodiment disclosed in Figure 6 had been disclosed to them by Noetix, (3) Noetix had provided Mr. Ross in 1995 with prototype cutters with a circumferential slit in the inner sleeve, (4) the Vit Commander had been based on technology used in the Diskecter, as reflected in Scieran's February 1995 Business Plan, (5) the Vit Commander had been presented at the September *1995* Retina Society meeting, or (6) Dr. Tornambe had used the Vit Commander in surgery for years before 1998 (as set forth on Scieran's website); and identify each person with knowledge of those reasons and each document relating thereto.

RESPONSE TO INTERROGATORY NO. 15

Plaintiff objects to this Interrogatory to the extent that it is overly broad, not relevant, and not likely to lead to the discovery of admissible evidence. Plaintiff also objects to the extent that the Interrogatory is unduly burdensome and oppressive in that it seeks a narrative and that there

13

are alternative discovery devices more suitable to such inquiry.  Plaintiff also objects to this

Interrogatory to the extent that it seeks legal conclusions and that it seeks information subject to

attorney work product protection.  Plaintiff also objects to this Interrogatory to the extent that it

exceeds the maximum of 25 in number in violation of the Court's Scheduling Order.

As to objections and legal analysis,
O'CONNOR CHRISTENSEN & McLAUGHLIN, LLP

Dated: June 6, 2005

_____
Edward F. O'Connor
Becky V. Christensen
Craig McLaughlin
1920 Main Street, Suite 150
Irvine, California 92614
(949) 851-5000
(949) 851-5051 fax

Josy W. Ingersoll (#1088)
Adam W. Poff (#3990)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware  19899-0391
(302) 571-6672
Attorneys for Scieran Technologies, Inc.

14

## VERIFICATION

I, Rod Ross, am President of Scieran Technologies, Inc., Plaintiff in the matter of *Scieran Technologies, Inc. v. Bausch & Lomb Incorporated,* in the U.S. District Court for the District of Delaware, Case No. C.A. No. 04-1319 (SLR). The matters stated in the foregoing Response to Defendant Bausch & Lomb's Second Set of Interrogatories to Scieran Technologies are true of my own knowledge except as to those matters which are stated on information and belief.

I declare under penalty of perjury under that the foregoing is true correct.

Executed on June 6, 2005 in _Laguna Hills_ , California.

Rod Ross, President,
Scieran Technologies, Inc.

# EXHIBIT B



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.

## v.

# Bausch & Lomb, Incorporated

## C.A. # 04-1319 (SLR)

---

### Transcript of:

### James Christopher Boore

### July 29, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Scieran Technologies, Inc.                                     Bausch & Lomb, Incorporated
James Christopher Boore          v.        C.A. # 04-1319 (SLR)          July 29, 2005

Page 22

1   Q. Do you know what the structure of the inner
2   cutter of the Diskecter was?
3   A. No.
4   Q. You said in preparation for your deposition you
5   spoke with Mr. Ross. Did you speak with anyone else?
6   A. I spoke with Craig McLaughlin and --
7   Q. I'm sorry?
8   A. And with Greg Hughes.
9   Q. When did you speak with Mr. McLaughlin?
10   A. Monday, this week.
11   Q. And when did you speak with Mr. Hughes?
12   A. Monday, this week.
13   Q. What did you and Mr. Hughes speak about?
14   A. It was a group meeting. We just all got together
15   to talk about the depositions.
16   Q. Did you obtain any information from Mr. Hughes to
17   provide in response to these notices of deposition that
18   were marked as Exhibits 1 and 2?
19   A. I don't think there was anything, anything new
20   that I learned in those meetings.
21   Q. Did you learn anything from Mr. Ross that you
22   would provide in response to these notices of deposition?
23   MR. McLAUGHLIN: Objection, asked and
24   answered.

Page 23

1   Q. You can answer.
2   A. As I said, I didn't learn anything new from those
3   meetings.
4   Q. Did you review any documents in preparation for
5   your deposition?
6   A. The individual patents.
7   Q. Other than the patents. I'm sorry, you had said
8   that.
9   A. No.
10   Q. Did you learn anything from Mr. McLaughlin in
11   preparing for your testimony as a Scieran witness?
12   MR. McLAUGHLIN: Objection. To the extent
13   it calls for attorney/client information, that would be
14   privileged, I'm instructing you not to answer that
15   question.
16   MR. BLUMENFELD: Well, all I asked was
17   whether you had learned anything from Mr. McLaughlin.
18   MR. McLAUGHLIN: Once again, it goes to the
19   communication of attorney/client and is privileged, and
20   I'll instruct you not to answer that question.
21   BY MR. BLUMENFELD:
22   Q. Was part of your preparation to testify as a
23   30(b)(6) witness for Scieran getting information from Mr.
24   McLaughlin?

Page 24

1   A. I don't know what a 30(b)(6) is.
2   Q. The corporate witness in response to Defendant's
3   Exhibits 1 and 2. I'm sorry.
4   A. Could you restate the question?
5   Q. Was part of the process in getting information to
6   testify today to obtain information from Mr. McLaughlin?
7   A. No.
8   Q. And you didn't obtain any information from Mr.
9   McLaughlin for your testimony today?
10   A. No.
11   Q. Did you look at what are sometimes called the
12   prosecution histories or the file histories of any of the
13   three patents that you talked about?
14   A. I don't even know what those are. Can you tell
15   me what a prosecution history is?
16   Q. It is the back and forth between a patent
17   applicant and the Patent Office when you apply for a
18   patent.
19   A. No.
20   Q. Were you involved at all in the prosecution of
21   the applications for the three patents?
22   A. No.
23   Q. Do you know who was involved in that?
24   A. Ben Yorks, the patent attorney.

Page 25

1   Q. Did you do anything in preparation for your
2   deposition today to educate yourself in any way about
3   what happened during the prosecution of the application
4   for the three patents?
5   A. No.
6   Q. Why not?
7   A. I don't know. Didn't even occur to me.
8   Q. When was the last time you spoke to Ben Yorks?
9   A. I don't, I don't know the date.
10   Q. Has it been a number of years?
11   A. Many years, yes.
12   Q. Did you provide information to Mr. Yorks in
13   connection with the prosecution of the applications for
14   the two patents that are in suit in this case? Would it
15   help if I showed you those patents so you know which ones
16   we are talking about?
17   A. Well, I mean, at some point probably we will need
18   to look at them. I really don't recall what information
19   I may have given to Ben Yorks at the time. I remember
20   having a couple of meetings in his office and --
21   MR. McLAUGHLIN: Let me just interject an
22   objection here. If you are going to go on and talk about
23   any communications you had with Mr. Yorks, I'll instruct
24   you not to reveal those.

7 (Pages 22 to 25)

Page 102

1  Q.  Did you talk to the prosecuting attorney?
2  A.  No.
3      MR. BLUMENFELD:  I guess I'm struggling with
4  how it could take all afternoon.
5      MR. McLAUGHLIN:  Just a simple question to
6  rephrase, instead of a narrative.
7  BY MR. BLUMENFELD:
8  Q.  Is it correct, Mr. Boore, that you have no
9  knowledge about the prosecution of the applications for
10  these three patents?
11  A.  Are you asking do I have any knowledge of kind of
12  the process for how you apply for a patent?
13  Q.  No.  I was asking, do you have any knowledge of
14  the specifics of what happened during the prosecution of
15  the applications for these three patents?
16  A.  I have no knowledge about that.
17  Q.  During the prosecution of the applications, of
18  the '111 and the '986 patents, Defendant's Exhibit 15 and
19  33, those are the two patents that we are litigating over
20  here, how were decisions made as to what patents and
21  articles and other information would be submitted to the
22  Patent Office?
23  A.  I don't know.
24  Q.  How was the decision made as to what patents and

Page 103

1  articles and other information would be submitted to
2  Scieran's attorneys?
3  A.  I don't know.
4  Q.  Who is the person at Scieran who was interfacing
5  with the patent attorneys?
6  A.  Rod Ross.
7  Q.  And did you talk to Mr. Ross in preparation for
8  this deposition about what he knew about the prosecution
9  of these applications?
10  A.  No, I didn't.
11  Q.  Why didn't you do that?
12  A.  I didn't even consider it.  I mean, I just didn't
13  even consider it or think about it.
14  Q.  Well, do you still have Defendant's Exhibit 2 in
15  front of you?
16  A.  Yes.
17  Q.  Can you look at category 6 and 7.
18  A.  Mm-hmm.
19  Q.  Those are, those categories are the prosecution
20  of the application for the '111 patent and the
21  prosecution of the application for the '986 patent,
22  right?
23  A.  Right, mm-hmm.
24  Q.  You understood that you were being designated to

Page 104

1  testify for Scieran about that?
2  A.  What I understood was that I was designated to
3  say whether I knew about that.  But I don't know anything
4  about it.  All I know is our patent attorney took care of
5  everything.
6  Q.  And if anyone at Scieran knows anything about
7  that, it would be Mr. Ross, right?
8  A.  I really couldn't -- I really don't know, but I,
9  I just know I don't.
10      MR. BLUMENFELD:  I don't have anything else
11  for Mr. Boore on the first two notices.  I'm not closing
12  the deposition because I don't think that we have had an
13  adequate witness on some subjects, but I'm also not going
14  to discuss that while Mr. Boore is here.  We can discuss
15  that between the lawyers.  Okay.
16      And I guess we can go off for a minute and
17  switch seats and do whatever we are going to do.
18      MR. McLAUGHLIN:  Miss Polizoti is taking
19  over?
20      MR. BLUMENFELD:  Yes, she is taking over.
21      MS. DuPHILY:  We are going off the record at
22  approximately 2:05 p.m.
23      (Recess taken.)
24      MS. DuPHILY:  We are back on the record at

Page 105

1  approximately 2:15 p.m.
2          EXAMINATION
3  BY MS. POLIZOTI:
4  Q.  Good afternoon, Mr. Boore.  If you don't
5  understand a question, will you let me know?
6  A.  Sure.
7  Q.  If you want to take a break, just let me know and
8  we will do that.
9  A.  All right.
10      MS. POLIZOTI:  Let me mark as Defendant's
11  Exhibit 34, this is the third notice of the 30(b)(6)
12  deposition for Bausch & Lomb.
13      (Defendant's Deposition Exhibit 34 was
14  marked for identification.)
15  Q.  Have you seen this document before?
16  A.  Yes, I believe so.
17  Q.  And do you understand that you are here today to
18  testify on all the topics that are listed --
19  A.  Yes.
20  Q.  -- in this document?  When you were meeting with,
21  earlier this week, on Monday, with Mr. Ross and Mr.
22  McLaughlin and Mr. Hughes, did you talk to them about the
23  topics that are listed here?
24      MR. McLAUGHLIN:  I'll just object on the

27 (Pages 102 to 105)

# EXHIBIT C



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

## C.A. # 04-1319 SLR

---

Transcript of:

Rodney L. Ross

August 11, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Scieran Technologies, Inc.                    v.                    Bausch & Lomb, Incorporated
Rodney L. Ross                          C.A. # 04-1319 SLR                    August 11, 2005

Page 26

1    A. I'm not -- what do you mean "testing"?
2    Q. Well, you made -- in 1996 Scieran made
3    prototypes of the Vit Commander; is that right?
4    A. Okay. Yes.
5    Q. And those were used for testing first on animals
6    and then on humans; is that right?
7    A. Correct.
8    Q. You had some surgeons who were using them in
9    surgery, right?
10   A. Right.
11   Q. When was that? When was that done?
12   A. When was what done?
13   Q. The surgery with the prototypes.
14   A. I would guess somewhere at '96, '97.
15   Q. Who were the doctors who were using the
16   prototypes?
17   A. As I recall, we worked mainly with Dr. Tornambe.
18   Q. Were there any other doctors you recall working
19   with with the prototypes?
20   A. He's the main -- that's the only one that I can
21   recall.
22   Q. And were documents kept concerning the results
23   of the testing that Dr. Tornambe did?
24   A. There may have been, but I don't have those.

Page 27

1    Q. What happened to them?
2    A. I don't know.
3    Q. Those were things that were thrown out in 2000
4    or 2001?
5    A. Well, it's possible. I remember Mark Moyer
6    helped me pare down the documents.
7    Q. Who is Mark Moyer?
8    A. Mark Moyer was vice president of operations with
9    Scieran Technologies.
10   Q. And when did Mr. Moyer work at Scieran?
11   A. He joined us in, I don't know, maybe -- maybe
12   2000. He worked with us for perhaps around a year until
13   the time we closed the office.
14       MR. BLUMENFELD: Could you read that back,
15   please?
16       (The reporter read back as instructed.)
17   BY MR. BLUMENFELD:
18   Q. Do you stay in contact with Mr. Moyer?
19   A. No. I haven't talked with him in a long time.
20   Q. Do you know where he lives?
21   A. I believe he lives in San Diego.
22   Q. In 2000, 2001 with the move first from Cabot
23   Road and then from the storage facility to your garage,
24   can you estimate for me the amount, the volume of Scieran

Page 28

1    documentation that was destroyed?
2    A. Just an estimate, I'd say that we took it
3    from -- we probably -- from the Scieran office to the
4    storage facility, we probably pared it down by at least
5    50 percent and then probably at least another 50 percent
6    when I moved into my garage.
7    Q. So at least 75 percent of the documents that
8    existed in 2000 at Scieran have been destroyed?
9    A. Probably so, yeah.
10   Q. At the time that you closed the Cabot Road
11   office, you knew that patents were going to issue to
12   Scieran; is that right?
13   A. I wasn't sure.
14   Q. In 2000 you weren't sure?
15   A. I don't think that you can guarantee that any
16   patent will issue.
17   Q. You thought that the patents were going to issue
18   in 2000; is that right?
19   A. Our patent attorney thought there was a chance.
20   Q. And you were writing to people in 2000, early
21   2000, and telling them that once your patents had issued
22   or your patent issued, that Bausch & Lomb was going to be
23   infringing; is that right?
24   A. What correspondence are you referring to?

Page 29

1    Q. Letters that you wrote to potential licensees
2    back in 2000.
3    A. I'm not sure which letters you're talking about.
4    I don't remember the content of those letters. I did
5    approach a number of companies over the potential
6    purchase of Scieran or our technologies, our patent, that
7    could be issued.
8    Q. When did you learn that Bausch & Lomb had a
9    vitrectomy device with a circumferential slit and a
10   prebent tip?
11   A. When I bought some of the cutters and gave them
12   to Gregg for him to disassemble.
13   Q. And when was that?
14   A. Could have been three, four years ago.
15   Q. When was the first time that you started
16   thinking that you might have a patent infringement claim
17   against Bausch & Lomb?
18   A. I don't remember the date, but it was several
19   years ago.
20   Q. Can you describe, Mr. Ross, your post high
21   school educational background?
22   A. I got a marketing degree from North Texas State
23   University and then spent two years at Coca-Cola U.S.A.,
24   two years at Procter & Gamble, then I joined CooperVision

8 (Pages 26 to 29)



**WILCOX & FETZER LTD.**

In the Matter Of:

# Scieran Technologies, Inc.
## v.
# Bausch & Lomb, Incorporated

## C.A. # 04-1319 SLR

---

Transcript of:

Rodney L. Ross

August 12, 2005

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Scieran Technologies, Inc.                    v.              Bausch & Lomb, Incorporated
Rodney L. Ross                        C.A. # 04-1319 SLR                 August 12, 2005

Page 223

1    Q. On the technical side, what kind of
2  documentation was kept?
3    A. Well, that was more under the auspices of Gregg.
4  Chris and I are salespeople.
5    Q. And, as far as you know, those documents don't
6  exist?
7    A. Not to my knowledge.
8    Q. This in the introduction refers to three product
9  projects underway. First one is the high-speed posterior
10 vitrectomy system. That was the Vit Commander, right?
11 And then the second one is a Xenon light source, and the
12 third one is a Xenon endophotocoagulator. Right?
13   A. Yes.
14   Q. Were all three of those developed as products?
15   A. The first two were. The third was not.
16   Q. Was the light source a light source for doctors
17 to use during posterior eye surgery?
18   A. Correct.
19   Q. And when was that marketed?
20     MR. McLAUGHLIN: Objection. Assumes facts.
21   A. I don't recall when that was rolled out, but it
22 was a product that was pretty well off the shelf from
23 another vendor.
24   Q. Was it a successful product for Scieran?

Page 224

1    A. Yes, it was.
2    Q. Did you make money on that?
3    A. Yes, we did.
4    Q. You didn't make money on the Vit Commander,
5  right?
6    A. Well, at the end of the day, we weren't -- the
7  company was not profitable.
8    Q. The company lost money, right?
9    A. Correct.
10   Q. Now, on the Vit Commander System that's being
11 referred to here in the second paragraph, the posterior
12 vitrectomy device being marketed as the Vit Commander
13 System, you were referring there to the new Vit Commander
14 System that Mr. Hughes had developed, right?
15   A. Yes.
16   Q. Now, can you turn to page 2, please?
17   A. (Complied.)
18   Q. In the second paragraph on page 2, you wrote:
19 "Paul Tornambe, M.D. of La Jolla, California, presented
20 his experience with the Vit Commander System to his
21 colleagues at the Retina Society Meeting in London during
22 July, 1995 and again at the Vitreous Society Meeting in
23 Santa Fe, New Mexico during September, 1995."
24     Do you see that?

Page 225

1    A. Uh-huh.
2    Q. And that was the Noetix Vit Commander System,
3  right?
4    A. Yes, I believe it was.
5    Q. And why were you including Mr. -- or
6  Dr. Tornambe's experiences with the Noetix Vit Commander
7  System in your business plan for your Vit Commander
8  System?
9    A. I think it was just a mistake on our part.
10   Q. Did you catch that mistake and fix that?
11   A. I don't recall.
12   Q. In fact, you used Dr. Tornambe's videotape with
13 the Noetix Vit Commander to market your Vit Commander
14 System, didn't you?
15   A. That I don't recall.
16   Q. Can you turn to the section starting on page 7
17 called "THE TECHNOLOGY"?
18   A. (Complied.)
19   Q. Starts off by saying, "The Vit Commander System
20 is more of a vitreous shaver than a traditional vitreous
21 cutter."
22     Do you see that?
23   A. Yes.
24   Q. And that was taken from your earlier business

Page 226

1  plans about the Noetix system, right?
2    A. That exact statement?
3    Q. Yes.
4    A. I don't recall. Possibly.
5    Q. That's an accurate statement with respect to the
6  Noetix system, isn't it?
7    A. I would consider it to be true.
8    Q. And down a couple paragraphs later where it
9  says, "The Vit Commander System consists of three key
10 components," the first one says, "Cutting tip - a
11 single-use disposable, stainless steel cutter which is
12 locked into (via a proprietary locking mechanism) and
13 driven by the reusable handpiece."
14     That was the same thing you said in earlier
15 business plans about the Noetix system, wasn't it?
16   A. I don't recall.
17   Q. Can you turn to the next page, please?
18   A. (Complied.)
19   Q. Down about 10 lines from the bottom, the
20 second-to-last paragraph, the second sentence, you said,
21 "The cutting mechanism uses two seamless cannulas which
22 allow more strict tolerances to be used."
23     Same thing you said in your earlier
24 business plan about the Noetix system?

6 (Pages 223 to 226)

Scieran Technologies, Inc.
Rodney L. Ross

v.

C.A. # 04-1319 SLR

Bausch & Lomb, Incorporated
August 12, 2005

Page 227

1   A.  That's correct.
2   Q.  Can you turn to the patent position statement?
3   A.  (Complied.)
4   Q.  That's at the bottom of page 9, right?
5   A.  Yes.
6   Q.  At this time in June 1996, what unique designs
7   had Scieran applied for patent protection on?
8   A.  I don't believe --
9       MR. McLAUGHLIN:  If you recall.
10      THE WITNESS:  I'd have to look at what our
11  filing date was.
12  Q.  Can you read to yourself the whole section here
13  on patent position?  It's not very long.
14  A.  "The posterior vitrectomy market" --
15  Q.  You can read to yourself.
16  A.  I'm sorry.  Okay.
17  Q.  There's a reference in here to a patent on the
18  drive technology.  Do you see that?
19  A.  Yes.
20  Q.  And then there's a reference to the patent
21  position on the vacuum control.  Did you see anything in
22  here on a patent on the cutters?
23  A.  It talks about cutting effectiveness.
24  Q.  Right, but doesn't talk about a patent on the

Page 228

1   cutters?
2   A.  No.
3   Q.  In this time in June of 1996 why did Scieran not
4   apply for patent protection on its cutter design?
5   A.  I don't believe that we had made full decisions
6   on the design we would go with.
7   Q.  Even by June of 1996 you hadn't made that
8   decision?
9   A.  That's my recollection.
10  Q.  When was that decision made?
11  A.  I don't recall the date.
12  Q.  Let me show you Defendant's Exhibit 40.  It's
13  called "Scieran Technologies Vit Commander System
14  Marketing Plan," also from June of 1996.
15      Have you had a chance to look at this,
16  Mr. Ross?
17  A.  I'm almost through with it.
18  Q.  Okay.
19  A.  Okay.
20  Q.  What is Exhibit 40?
21  A.  As I recall, this was prepared by Chris Boore.
22  It is another internal marketing document.
23  Q.  And it starts off by talking about the Vit
24  Commander System.  Which Vit Commander System was this a

Page 229

1   marketing plan for?
2   A.  The Vit Commander System being developed by
3   Gregg Hughes.
4   Q.  And after the first sentence this marketing plan
5   says, "The original prototype device has proven to be
6   well received by the surgeons who have used it in
7   surgery."
8       Do you see that?
9   A.  Yes.
10  Q.  And that original prototype device that's
11  referred to is the Noetix system; is that right?
12  A.  I'm not sure what he's referring to here.
13  Q.  Well, let's read the next sentence.  It says,
14  "Surgical evaluation of a second generation device with
15  significantly upgraded handpiece and console design will
16  begin in mid-June."
17      Does that tell you that the original
18  prototype is the Noetix device?
19  A.  Yes.
20  Q.  And did surgical evaluation of a
21  second-generation device begin in mid-June of 1996?
22  A.  It would be my recollection that we started on
23  it well before that.
24  Q.  Do you know why Mr. Boore was calling the

Page 230

1   Scieran Vit Commander a second-generation device?
2   A.  I do not.
3   Q.  He referred in here to the upgraded handpiece
4   and console design.  Do you see that?
5   A.  Yes.
6   Q.  He didn't say anything about a change in the
7   cutter.  Do you know why not?
8   A.  I have no idea.
9   Q.  Can you turn to page -- it's the last page,
10  CB343.
11  A.  (Complied.)
12  Q.  You see that there's a heading called
13  "Publications"?
14  A.  Yes.
15  Q.  Let me read you that paragraph.  It says, "The
16  performance of the Vit Commander System was
17  presented by Paul Tornambe, M.D. at both the
18  Vitreous Society meeting in London during August,
19  1995 and again at the Retina Society meeting in
20  Santa Fe, New Mexico during September.  These
21  talks included a video and slide presentation.
22  Scieran had a display booth at the Retina Society
23  meeting.  Dr. Tornambe's presentation materials
24  were also presented at the annual AAO course on

7 (Pages 227 to 230)

Page 231

1    new vitreoretinal technology conducted by
2    William Mieler, M.D. and Dennis Han, M.D. at a
3    conference in Japan."
4        Do you see that?
5    **A. Uh-huh.**
6    Q.  Now, everything in that paragraph refers to the
7    Noetix Vit Commander System, doesn't it?
8    **A. Yes, I believe it does.**
9    Q.  Why were you including information about the
10   Noetix Vit Commander System in your June 1996 marketing
11   plan?
12   **A. I think that was a mistake.**
13   Q.  So it was another mistake?
14   **A. Yes, sir.**
15   Q.  And it refers in there to a slide presentation
16   by Dr. Tornambe?
17   **A. Uh-huh.**
18   Q.  Do you know where that slide presentation is?
19   **A. I don't know that I ever saw it. That would**
20   **have been his personal presentation.**
21   Q.  Let me show you Defendant's Exhibit 46. This is
22   a September '96 Scieran business plan. Again, I'll ask
23   you just to flip through this rather than take the time
24   to read every word.

Page 232

1    **A. Sure. Okay.**
2    Q.  Can you tell me what Defendant's Exhibit 46 is?
3    **A. This would be another internal marketing -- a**
4    **business plan.**
5    Q.  And who wrote this business plan?
6    **A. I believe this would have been prepared by**
7    **Chris Boore.**
8    Q.  And did you get a copy of it?
9    **A. Yes, I believe I did.**
10   Q.  Did you work with him in preparing this?
11   **A. I don't remember specifically.**
12   Q.  Was this distributed to anyone?
13   **A. I don't believe it was, because these types of**
14   **documents I considered internal.**
15   Q.  This is about the Scieran second-generation Vit
16   Commander System, right?
17   **A. This is talking about the one we were developing**
18   **ourselves.**
19   Q.  Can you look at page 2? At the top of the page,
20   the second paragraph says, "A company entering the
21       posterior vitrectomy market today is hampered by
22       the existing patents in this product area.
23       Scieran Technologies has established a strategic
24       patent position which will make it even more

Page 233

1    difficult for other companies wanting to enter
2    this business in the future. This will make
3    Scieran Technologies even more valuable to those
4    companies wanting to enter the market."
5        What was meant by that last sentence, that
6    this patent position would make Scieran even more
7    valuable to those companies wanting to enter the market?
8    **A. We were trying to patent a variety of features**
9    **to make the company more valuable, to maybe an acquiring**
10   **party.**
11   Q.  Was Scieran interested in this time ultimately
12   in selling itself to someone else?
13   **A. That's something that we had discussed.**
14   Q.  Did you try to sell yourself to other companies?
15   **A. At different junctures, yes.**
16   Q.  Did you have any success in doing that?
17   **A. We never sold the company.**
18   Q.  Why not?
19       MR. McLAUGHLIN: Objection. Speculative.
20   **A. It is hard to say why companies -- I can't read**
21   **their mind. I don't know what's going on inside a**
22   **company at different times that forces them to make**
23   **different decisions.**
24   Q.  You found that nobody was interested in

Page 234

1    acquiring Scieran; is that right?
2        MR. McLAUGHLIN: Same objection.
3    **A. No, that's not true.**
4    Q.  But nobody did acquire it?
5    **A. That's correct.**
6    Q.  Let me read you a paragraph two paragraphs after
7    that. It says, "Paul Tornambe, M.D. of La Jolla,
8        California presented his experience with the Vit
9        Commander System to his colleagues at the Retina
10       Society Meeting in London during July, 1995 and
11       again at the Vitreous Society Meeting in
12       Santa Fe, New Mexico during September, 1995.
13       Other surgeons have utilized Dr. Tornambe's
14       presentation material while addressing their
15       piers [sic] on new technology utilized in
16       posterior vitrectomy surgery. William Mieler,
17       M.D. and Dennis Han, M.D. discussed the Vit
18       Commander System during their presentation on new
19       technology at the 1995 A.A.O. in Atlanta,
20       Georgia. Most recently, Kirk Packo, M.D., a
21       noted vitreoretinal surgeon from Chicago,
22       Illinois, described the Vit Commander System in
23       his presentation on new vitreoretinal technology
24       at a symposium in Japan."

8 (Pages 231 to 234)

Scieran Technologies, Inc.                                    Bausch & Lomb, Incorporated
Rodney L. Ross                    v.                                  August 12, 2005
                           C.A. # 04-1319 SLR

---

Page 235

1       Do you see that?
2    A.  Yes.
3    Q.  And all of that material about presentations of
4  the Vit Commander System refers to the Noetix system;
5  isn't that right?
6    A.  I believe so.
7    Q.  So why was that included in your September 1996
8  Scieran marketing plan?
9    A.  I think we just updated this document. We
10  failed to remove that section. That was our mistake.
11    Q.  So this was at least the third time you made
12  that mistake?
13    A.  Yes, sir.
14    Q.  Can you turn to page 3, please?
15    A.  (Complied.)
16    Q.  Right under "SCIERAN TECHNOLOGIES, INC." it
17  says, "The word 'Scieran' is Greek meaning 'to shear.'
18  This term was selected for the name of the company
19  because of the unique shearing effect offered by the
20  guillotine cutter of the Vit Commander System."
21       That was actually the name chosen for the
22  Noetix Vit Commander System, right?
23       MR. McLAUGHLIN:  Objection.  Vague and
24  ambiguous.

---

Page 236

1  BY MR. BLUMENFELD:
2    Q.  Let me ask it again.  That was the name you
3  chose for the company when you thought you were going to
4  market the Noetix Vit Commander System?
5    A.  That's right.
6    Q.  And it was a name that was suggested to you by
7  Alan Schechter, correct?
8    A.  I believe so.
9    Q.  And that's because the Noetix system that he
10  brought to you offered the unique shearing effect that
11  you talked about there, right?
12    A.  Well, high-speed cutting should offer a shearing
13  effect.
14    Q.  And you were touting earlier the unique shearing
15  effect of the Noetix Vit Commander System, right?
16    A.  Yes.
17    Q.  Let me show you Defendant's Exhibit 10.  It's an
18  October 9th, 1996, letter from you to Dr. De Juan.
19    A.  Okay.
20    Q.  What is Defendant's Exhibit 10?
21    A.  It's an introductory letter that I sent to
22  Dr. De Juan on October 9th, 1996, in Baltimore, Maryland.
23    Q.  This was produced to us by Promex.  Do you know
24  what happened to your copy of this letter?

---

Page 237

1    A.  I do not.
2    Q.  I'm sorry.  Go ahead.
3    A.  This may have been a number of the documents
4  that I discarded just because I didn't have space to keep
5  them in.
6    Q.  Did you send other letters like this to other
7  doctors?
8    A.  I may have.  I don't recall.
9    Q.  Do you know why you selected Dr. De Juan to get
10  one of these letters?
11    A.  No, I don't recall.
12    Q.  In the letter, the second paragraph, you refer
13  to an "enclosed 7 minute surgical video tape which
14  presents the high speed guillotine cutting concept in use
15  by Paul Tornambe, M.D."
16       Do you see that?
17    A.  Yes.
18    Q.  And you did send a surgical videotape to
19  Dr. De Juan, right?
20    A.  I would assume so.
21    Q.  And when was that videotape of the Vit Commander
22  by Dr. Tornambe made?
23    A.  I'm not sure.  I'm not sure which videotape I
24  included.

---

Page 238

1    Q.  You know that there was a videotape that
2  Dr. Tornambe made of the Noetix --
3    A.  Right.
4    Q.  -- Vit Commander System?
5    A.  Right.
6    Q.  And that's the one that you sent to Dr. De Juan
7  in 1996, isn't it?
8    A.  If it was, it was my mistake.
9    Q.  Can you turn to the second page of this?
10    A.  (Complied.)
11    Q.  There's what appears to be an article. I can't
12  really tell what it is.  Can you tell me what that is?
13    A.  It appears to be -- it's on Dr. Tornambe's
14  letterhead.
15    Q.  But it's something that you had to send to
16  Dr. De Juan, right?
17    A.  Yes.
18    Q.  Now, in this piece by Dr. Tornambe, he's
19  referring to the Vit Commander, right?
20    A.  Right.
21    Q.  In the second paragraph he says, "'At first, I
22  was skeptical that a new vitrectomy instrument would be a
23  significant improvement over instruments presently
24  available.'"  and I'll skip the rest of that sentence.

9 (Pages 235 to 238)

Scieran Technologies, Inc.
Rodney L. Ross

v.

C.A. # 04-1319 SLR

Bausch & Lomb, Incorporated
August 12, 2005

Page 239

1    Then it says, "'My mind quickly changed
2 after trying a prototype Vit Commander cutter.'"
3    Do you see that?
4    **A. Yes.**
5    Q. What he was referring to there was the Noetix
6 Vit Commander cutter, right?
7    **A. I assume so.**
8    Q. Why were you using material about the Noetix Vit
9 Commander System to promote the Scieran system?
10   **A. I think it was my mistake.**
11   THE VIDEOGRAPHER: Going off the record at
12 approximately 10:35 a.m.
13   (Discussion off the record.)
14   THE VIDEOGRAPHER: We're back on the record
15 at approximately 10:35 a.m.
16 BY MR. BLUMENFELD:
17   Q. Mr. Ross, when did Scieran start promoting the
18 Vit Commander on its Web site?
19   **A. I don't know what date we established a Web**
20 **site.**
21   Q. Turning back to Exhibit 10, if you turn to the
22 third page and the fourth page, there's what appears to
23 be some kind of promotional material about the Vit
24 Commander System.

Page 240

1    **A. Yes.**
2    Q. And when did you publish that, do you know?
3    **A. No, I don't know when this was published.**
4    Q. Do you know what happened to Scieran's copies of
5 its promotional material about the Vit Commander?
6    **A. I didn't keep much of that.**
7    Q. This piece of promotional material which is on
8 the Vit Commander, pages 3 and 4 of Exhibit 10 --
9    **A. Yes.**
10   Q. -- it says, "See it at the AAO in Chicago."
11   **A. Yes.**
12   Q. And in your cover letter you refer to the AAO
13 show in Chicago "later this month."
14   **A. Yes.**
15   Q. So can we agree that the AAO show in Chicago
16 that's referred to was in October of 1996?
17   **A. Yes.**
18   Q. And do you know how much before the AAO show
19 Scieran started distributing this promotional material
20 about the Vit Commander?
21   **A. No, I do not.**
22   Q. But you know that it was at least by
23 October 9th?
24   **A. Correct.**

Page 241

1    Q. And if it was before October 9th, can you tell
2 me your best estimate as to when that would be?
3    **A. No, I cannot.**
4    Q. And are there any records at Scieran which would
5 show when Scieran started distributing this brochure
6 about the Vit Commander?
7    **A. Not that I know of.**
8    Q. If they existed, would they have been destroyed
9 back in 2001?
10   **A. It's possible.**
11   Q. During the time that you were prosecuting your
12 patent applications, did you provide a copy of this
13 brochure to the Patent Office?
14   **A. I believe that we gave a copy of this to our**
15 **patent attorney.**
16   Q. That was Mr. Yorks?
17   **A. Yes.**
18   Q. Do you know whether a copy of this was given to
19 the United States Patent Office?
20   **A. I have no idea.**
21   MR. McLAUGHLIN: Mr. Ross, in the future,
22 if there's anything that you are about to disclose about
23 any communications going to the patent attorney, would
24 you refrain from doing so?

Page 242

1    THE WITNESS: Yes.
2    Q. When did Scieran start promoting the Vit
3 Commander on its Web site?
4    **A. I told you a moment ago I'm not certain.**
5    Q. You don't remember?
6    **A. No.**
7    Q. Did Scieran maintain any of the documents
8 showing contracts it had to put material on its Web site?
9    **A. Contracts?**
10   Q. Right.
11   **A. I'm not sure what you mean.**
12   Q. Did someone design your Web site for you?
13   **A. I don't remember. I think maybe Chris had**
14 **overseen that. I'm not sure how that came about.**
15   Q. You do know that there was a time when Scieran
16 did start promoting the Vit Commander on its Web site?
17   **A. Yes.**
18   Q. Let me show you what's been marked as
19 Defendant's Exhibit 12. This is something that was
20 posted on your Web site as of January 10th, 1998.
21   **A. Yes.**
22   Q. You've seen this before?
23   **A. Yes, I have.**
24   Q. You don't have any reason to doubt that it was

10 (Pages 239 to 242)

Scieran Technologies, Inc.                          Bausch & Lomb, Incorporated
Rodney L. Ross                      v.                      August 12, 2005
                              C.A. # 04-1319 SLR

Page 243

1   posted on your Web site in 1998?
2       A.  Right.
3       Q.  I don't know if I was criticized.  I called it a
4   testimonial from Dr. McBeath.  What would you call it?
5       A.  It could be a testimonial.
6       Q.  In the first paragraph of this it says, "I used
7   the first prototype model of the Vit Commander in 1994 on
8   pig eyes and it was immediately apparent that the cutter
9   system was going to be unique in design and application.
10  It has matured to the commercial model now available in
11  modular form as a cutter and console," etcetera.
12          The prototype model that Dr. McBeath used
13  of the Vit Commander in 1994 on pig eyes, that was the
14  Noetix system?
15      A.  That's correct.
16      Q.  And why were you putting material about the
17  Noetix Vit Commander System on your Web site in 1998?
18      A.  Well, we just asked Dr. McBeath to write
19  something about it and he wrote it.  It was his article
20  or his text.
21      Q.  Why did you decide to put text about the Noetix
22  system on your Web site?
23      A.  Well, I probably should have edited this.
24      Q.  Did you tell customers anywhere, potential

Page 244

1   customers, that the prototype Vit Commander System was
2   anything different than the product that you were
3   offering for sale?
4       A.  I don't believe so.
5       Q.  Did you provide a copy of this testimonial that
6   was on your Web site to the Patent Office during the
7   prosecution of your patent applications?
8       A.  I'm uncertain of that.
9       Q.  Do you know whether you gave a copy to
10  Mr. Yorks?
11          MR. McLAUGHLIN:  Objection.
12  Attorney/client privilege.
13          Don't answer it.
14  BY MR. BLUMENFELD:
15      Q.  Let me show you Defendant's Exhibit 13.  What is
16  Exhibit 13?
17      A.  Similar to the McBeath page.
18      Q.  This was a testimonial about Dr. Tornambe,
19  right?
20      A.  That's correct.
21      Q.  And it was posted on your Web site in 1998,
22  right?
23      A.  Yes.  I know it was posted on the Web site.  I'm
24  uncertain of the date.

Page 245

1       Q.  You don't have any reason to doubt the date that
2   you were able to pull it?
3       A.  Right.
4       Q.  It starts off by saying, "I have used the Vit
5   Commander System for the past several years and believe
6   it is a significant improvement over our present
7   instrumentation."
8           The Vit Commander System that Dr. Tornambe
9   had used several years earlier in 1998 was the Noetix
10  system, wasn't it?
11      A.  Yes.
12      Q.  And on your Web site you didn't draw any
13  distinction between the Noetix Vit Commander System and
14  your Vit Commander System?
15      A.  No, we did not.
16      Q.  Why didn't you?
17      A.  Looking back, I should have edited this.
18      Q.  Did you provide a copy of this material from
19  your Web site saying the Vit Commander System had been
20  used by Dr. Tornambe for the past several years to the
21  United States Patent Office?
22      A.  I don't recall.
23      Q.  Do you know whether you gave a copy of this to
24  Mr. Yorks during the prosecution of your patent

Page 246

1   applications?
2           MR. McLAUGHLIN:  Objection.
3   Attorney/client privilege.
4           Don't answer it.
5           MR. BLUMENFELD:  You want to take a break?
6           THE VIDEOGRAPHER:  Going off the record at
7   approximately 10:45 a.m.
8           (A recess was taken.)
9           THE VIDEOGRAPHER:  Going back on the record
10  at 11:02 a.m.
11  BY MR. BLUMENFELD:
12      Q.  You still have Plaintiff's Exhibit 10 in front
13  of you.  That's the letter to Dr. De Juan.
14      A.  Yes, sir.
15      Q.  Can you go back to the two-page Vit Commander
16  System brochure that's attached to the letter?
17      A.  Uh-huh.
18      Q.  Who printed these for Scieran?
19      A.  Chris would have had that done.  I'm not sure
20  who printed it.
21      Q.  You didn't do them yourself, right?
22      A.  No.
23      Q.  Do you know who designed it?
24      A.  No, I don't.  Chris oversaw that.

11 (Pages 243 to 246)

Scieran Technologies, Inc.                         v.                Bausch & Lomb, Incorporated
Rodney L. Ross                              C.A. # 04-1319 SLR              August 12, 2005

Page 247

1   Q.  Do you know when it was designed?
2   A.  No, I do not.
3   Q.  If you look at the second page of it, on the
4   specifications, there's a reference to a cutter.  Do you
5   see that?  20-gauge, etcetera.  Down toward the bottom.
6   A.  Yes.
7   Q.  What was the cutter in the Vit Commander System
8   that was being promoted in this brochure?
9   A.  It was a 20-gauge quick connect single-use
10  disposable port location 0.015 inch from distal tip.
11  Q.  And what was the structure of the inner cannula
12  of that cutter?
13  A.  It would have been the cutter that Gregg had
14  established at that time.
15  Q.  With a circumferential slit?
16  A.  I believe so.
17  Q.  And a bent tip?
18  A.  I believe so.
19  Q.  And one that exerted a spring force on the inner
20  surface of the outer cannula?
21  A.  I would make that assumption.
22  Q.  Between -- we looked a little earlier at the
23  June 1996 business plan and the June 1996 marketing plan
24  and now we're looking at October '96 and the AAO show in

Page 248

1   Chicago.
2   A.  Yes.
3   Q.  Between June of 1996 and October of 1996, what
4   marketing efforts was Scieran making for the Vit
5   Commander System?
6   A.  Well, I would say we had this in place.  This
7   marketing piece.
8   Q.  "This" being the attachment to Defendant's
9   Exhibit 10?
10  A.  Correct.
11  Q.  This time period from June to October 1996, what
12  was Scieran doing about going out to try to promote the
13  Vit Commander System with doctors?
14  A.  I don't recall the details.  Chris was
15  overseeing that aspect of the business.
16  Q.  Do you believe that in June and July, August,
17  and September of 1996 that Scieran was promoting the Vit
18  Commander System to doctors?
19  A.  I would say so, yes.
20  Q.  And do you know if there's a list of doctors
21  that the Vit Commander System was being promoted to
22  between June and September of 1996?
23  A.  If there was a list of prospects, Chris would
24  have had that list.

Page 249

1   Q.  And do you know where that list is now?
2   A.  No, I do not.
3   Q.  During the period from June to September of
4   1996, was Scieran also promoting the Vit Commander System
5   with potential investors?
6   A.  Yes, I believe so.
7   Q.  During the prosecution of the application for
8   your patents, did you tell the Patent Office that Scieran
9   had been promoting the Vit Commander System between June
10  and September of 1996?
11  A.  I do not recall.
12  Q.  There's little question in your mind that
13  Scieran was, in fact, promoting it during that time
14  period --
15  A.  Correct.
16  Q.  -- to as many doctors as it could, correct?
17  A.  I would assume so.
18  Q.  With whatever product materials that it had?
19  A.  Yes.
20  Q.  And the Vit Commander System that it was
21  promoting at that time had a cutter blade with an inner
22  cannula that had a circumferential slit and a prebent
23  tip, right?
24  A.  I believe that's what Gregg was working on.

Page 250

1   Q.  And that was true in June of 1996 and in July of
2   1996 and in August of 1996 and in September of 1996; is
3   that correct?
4   A.  I believe so.
5   Q.  And the documents which would show those
6   promotional efforts by Scieran back in 1996 no longer
7   exist; is that right?
8   A.  They're not in my possession.  That's correct.
9   Q.  But there's no doubt in your mind that the
10  system was being promoted at that time?
11  A.  That's correct.
12      MR. BLUMENFELD:  Let's mark as Defendant's
13  Exhibit 64 a December 1st, 1997, looks like an article in
14  Retina/Vitreous.
15      (Defendant's Deposition Exhibit No. 64 was
16  marked for identification.)
17  A.  Okay.
18  Q.  Can you tell me what Defendant's Exhibit 64 is?
19  A.  It appears to be a journal article dated
20  December 19 -- December 1st, 1997.  It appears to have
21  been written by Paul Tornambe, M.D., and Robert Avery
22  M.D.
23  Q.  We know who Dr. Tornambe is.  Who is
24  Robert Avery?

12 (Pages 247 to 250)

Scieran Technologies, Inc.                    v.                    Bausch & Lomb, Incorporated
Rodney L. Ross                          C.A. # 04-1319 SLR                    August 12, 2005

Page 251

1      A. Dr. Avery was a retina surgeon located -- let me
2   see here -- in Santa Barbara.
3      Q. This was a document that was produced by
4   Scieran. Is this a reprint that Scieran was using for
5   promotional purposes?
6      A. Probably so.
7      Q. At the bottom right corner, the last thing, it
8   has contact information for Scieran, right?
9      A. Yes.
10     Q. This is about the Vit Commander, right?
11     A. That's correct.
12     Q. In the second paragraph the article reads:
13   "'There really hasn't been anything new in the area of
14   mechanical vitrectors probably for the past decade,' said
15   Paul E. Tornambe, MD, a retina specialist from Southern
16   California who helped develop the device and has been
17   using it for the past 2 years."
18          Do you see that?
19     A. Uh-huh.
20     Q. Now, the device he was using two years before
21   this December 1997 article was the Noetix Vit Commander
22   device, right?
23     A. That's correct.
24     Q. And you were using this as a promotional

Page 252

1   material, right?
2      A. Yes.
3      Q. And you didn't tell customers that that -- that
4   the 1995 Vit Commander was a different device than the
5   Vit Commander you were marketing, right?
6      A. No. We never thought of that. But we should
7   have.
8      Q. Another mistake?
9      A. Yes, sir.
10     Q. When did Dr. Avery get involved with Scieran?
11     A. That I don't know. I don't know the date. It
12   had to have been sometime before December 1st, 1997.
13     Q. Do you know whether there are any documents at
14   Scieran about its relationship with Dr. Avery?
15     A. I don't think we had too much more than arm's
16   distance relationship with him.
17     Q. But do you know whether there are any documents?
18     A. No, I don't know if ever any existed.
19         MR. BLUMENFELD: Let's mark as Defendant's
20   Exhibit 65 a memo from Chris Boore to you, dated
21   November 12, 1996.
22         (Defendant's Deposition Exhibit No. 65 was
23   marked for identification.)
24

Page 253

1   BY MR. BLUMENFELD:
2      Q. Can you tell me what Defendant's Exhibit 65 is?
3      A. It's a fax from Chris Boore to me, dated
4   November 12, 1996, where he's talking about -- the
5   subject is Noetix materials and RMA number to return
6   lights to ILC.
7      Q. What does the lights to ILC have to do with?
8      A. I think ILC is our source for the Xenon light
9   source. The Light Commander. And apparently we were
10   returning something to them and they required returned
11   goods number.
12     Q. Now, on the Noetix part of this fax, what was
13   going on between Scieran and Noetix at this time?
14     A. I don't know. I don't know.
15     Q. Were you considering suing Noetix at that time?
16     A. Not that I recall.
17     Q. Any memory at all of why the Noetix issue was on
18   the table in November of 1996?
19     A. No, I have no idea.
20     Q. Do you know what the Noetix materials were that
21   were faxed to you?
22     A. Well, I think it's the correspondence that he
23   had in his files pertaining to -- like the licensing
24   agreement.

Page 254

1      Q. Do you know what you did with the fax, the fax
2   documents that he sent to you?
3      A. I would assume that's a part of the stack that
4   we furnished you for the documents that you requested
5   from us.
6      Q. Why do you assume that?
7      A. Because that's a document that I had in my file.
8      Q. Do you know whether that included the documents
9   that were faxed to you in November of 1996?
10     A. I have no idea.
11     Q. Do you know whether it included any technical
12   documents?
13     A. No, I don't believe it would have.
14     Q. After the Vit Commander was on the market, I
15   think you testified yesterday that was sometime in 1997?
16     A. I believe so.
17     Q. After it was on the market, did you start
18   looking for people to distribute it for you?
19     A. Yes.
20     Q. And can you tell me what efforts you made to
21   find distributors?
22     A. Well, in the U.S. we contacted people that we
23   had already known or heard of, sales representatives.
24     Q. Who did you contact?

13 (Pages 251 to 254)

Scieran Technologies, Inc.
Rodney L. Ross

v.

C.A. # 04-1319 SLR

Bausch & Lomb, Incorporated
August 12, 2005

Page 283

1    Q.  Under "Market Launch Plan," it's the fourth
2  line. "Secondly, we plan to take orders"...
3    A.  Sorry. Yeah.
4    Q.  Why did Scieran plan to take orders utilizing
5  the new prototype for evaluation prior to launch and
6  availability?
7    A.  Well, I'm not sure -- I'm not sure what we
8  intended to do with that statement.
9    Q.  The next sentence says, "This will be
10  accomplished through a number of concurrent efforts."
11      And then you see the first three items
12  listed are papers and video being presented at the '95
13  meetings of the Vitreous Society and Retina Society,
14  first public exhibit at the Retina Society meeting in
15  September '95, and then it says prominent positioning at
16  the November 1995 AAO meeting.
17      You see those three things?
18    A.  Yes.
19    Q.  Why was Scieran planning on marketing the new
20  Vit Commander System by using 1995 materials regarding
21  the Noetix Vit Commander System?
22    A.  I think that was a mistake on our part. I
23  should have -- Chris wrote this. I should have
24  identified this and had him purge it.

Page 284

1    Q.  So this was another example of one of those
2  mistakes?
3    A.  Yes.
4    Q.  Now, in paragraph 4 there's a reference to an
5  ongoing direct mail campaign that will include
6  newsletters, video presentations, other promotional
7  pieces. We plan to begin this campaign July 1996,
8  continue it every six weeks through the end of the year.
9      Now, where are those newsletters, video
10  presentations, and other promotional pieces?
11    A.  I don't know that they were ever produced.
12    Q.  Well, you don't know that they weren't produced,
13  either, do you?
14    A.  No, I don't recall.
15    Q.  And if they were produced, where are they?
16    A.  I don't know.
17    Q.  Do you think they were discarded in 2001 along
18  with the other documents?
19      MR. McLAUGHLIN: Objection. Asked and
20  answered.
21    A.  I don't know.
22    Q.  You haven't seen them in years, right?
23    A.  That's correct.
24      MR. BLUMENFELD: Mr. Ross, let me show you

Page 285

1  and have marked as Defendant's Exhibit 70 a document
2  ST1828 through 1829.
3      (Defendant's Deposition Exhibit No. 70 was
4  marked for identification.)
5      THE WITNESS: Okay.
6  BY MR. BLUMENFELD:
7    Q.  This is a fax from you to Mike McGarrity, vice
8  president of Stryker Instruments; is that right?
9    A.  That's correct.
10    Q.  It's dated September 12, 1999?
11    A.  Yes.
12    Q.  And that is a few days after the Allergan
13  agreement was finally terminated, right?
14    A.  Right.
15    Q.  And Stryker Instruments is a big medical
16  products company, right?
17    A.  Correct.
18    Q.  And it refers to a visit that you, "you" being
19  McGarrity, and Steve made to southern California to
20  become familiar with Scieran's products. Do you see
21  that?
22    A.  Yes.
23    Q.  Who is Steve?
24    A.  I don't remember who -- maybe -- I don't know.

Page 286

1  I'm not sure who that was.
2    Q.  Someone else at Stryker?
3    A.  I don't know if he was with Stryker or not. I
4  don't recall the gentleman.
5    Q.  Do you remember Mr. McGarrity's visit?
6    A.  Yes, I did.
7    Q.  Can you tell us about that?
8    A.  As I recall, he came and visited our office and
9  we took him into surgery with Dr. Tornambe.
10    Q.  And did he view the Vit Commander being used in
11  surgery?
12    A.  Yes, he did.
13    Q.  After he did that, did Stryker display any
14  interest in either marketing the Vit Commander or
15  acquiring Scieran?
16    A.  As I recall, John Ferro had some discussions
17  with him beyond that, and I don't recall where it went.
18    Q.  You never did a deal with Stryker?
19    A.  That's correct, we did not.
20    Q.  And was that because they didn't have interest
21  in the product?
22    A.  I don't recall the -- if they ever gave a
23  reason. If they did, I don't recall it.
24      MR. BLUMENFELD: Let's mark as DX 71 a

21 (Pages 283 to 286)

# EXHIBIT D

08/739640

Our File No.:  002580.P001X



UNITED STATES PATENT APPLICATION

FOR

AN APPARATUS AND METHOD FOR
PERFORMING OPHTHALMIC PROCEDURES

INVENTORS:    Rod Ross
              Greggory Hughes
              James C. Boore

PREPARED BY:

BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN
12400 Wilshire Blvd., 7th Floor
Los Angeles, CA  90025-1026
(310) 207-3800

What is claimed is:

1    1.  A surgical cutter, comprising:

2    an outer sleeve which has an aspiration port that

3    is in fluid communication with an inner channel; and,

4    an inner sleeve that is located within said inner

5    channel of said outer sleeve, and which has a

6    circumferential slit located at a distal end of said

7    inner sleeve.


1    2.  The surgical cutter as recited in claim 1,

2    wherein said outer sleeve is constructed from a

3    flexible material and said inner sleeve has a plurality

4    of circumferential slits along a longitudinal axis of

5    said inner sleeve.


1    3.  A surgical system, comprising:

2    a cutter that has a cutting tip; and,

3    an electrical generator that is electrically

4    coupled to said cutter to provide electrical energy to

5    said cutting tip.


1    4.  The surgical system as recited in claim 3,

2    wherein said cutter includes an outer sleeve that has

3    an aspiration port in fluid communication with an inner

4    channel, and an inner sleeve that moves within said

5    inner channel.

002580.P001X          - 29 -      Patent Application

1    5.  The surgical system as recited in claim 4,

2  wherein said cutter includes an outer conductive layer

3  that is separated from said outer sleeve by a layer of

4  insulation, said outer sleeve and said outer conductive

5  layer are electrically connected to said electrical

6  generator.

1    6.  A surgical cutting system, comprising:

2      a motorized cutter that operates at a motor speed;

3  and,

4      a control circuit that senses the motor speed and

5  provides power to said motorized cutter at a level that

6  corresponds to the motor speed, wherein more power is

7  provided to said motorized cutter with a decrease in

8  the motor speed.

1    7.  The surgical cutting system as recited in

2  claim 6, wherein said control circuit includes a

3  differential amplifier that senses an output current of

4  said motorized cutter.

1    8.  A surgical cutting system, comprising:

2      a motorized cutter that operates at a motor speed;

3      a vacuum source that is coupled to said motorized

4  cutter to create a flow of aspiration fluid from said

5  motorized cutter;

002580.P001X                - 30 -          Patent Application

6      a valve that can be actuated between an on

7   position and an off position to control the flow of

8   aspiration fluid from said motorized cutter; and,

9      a control circuit that senses the motor speed and

10   drives said valve to the off position when the motor

11   speed falls below a threshold value.


1      9.   An irrigation system for a surgical cutting

2   device, comprising:

3      a source of irrigation fluid;

4      a valve that controls a flow of irrigation fluid

5   from said source of irrigation fluid; and,

6      an input device that controls said valve.


1      10.   The irrigation system as recited in claim 9,

2   wherein said valve can be actuated between an on

3   position and an off position.


1      11.   A vacuum system for a surgical cutting

2   device, comprising:

3      a cutter;

4      a first pump that is coupled to said cutter;

5      a second pump that is coupled to said cutter; and,

6      a controller that sequentially actuates said first

7   and second pumps.

1    12.   The vacuum system as recited in claim 11,
2 further comprising an input device that is coupled to
3 said controller.

1    13.   The vacuum system as recited in claim 12,
2 further comprising a vacuum reservoir that is connected
3 to said cutter and said first and second pumps.

1    14.   The vacuum system as recited in claim 12,
2 further comprising a vacuum transducer that is coupled
3 to said vacuum reservoir, and a differential amplifier
4 that is coupled to said input device, said vacuum
5 transducer and said controller.

1    15.   The vacuum system as recited in claim 11,
2 wherein said first pump creates a vacuum pressure and
3 said second pump creates a positive pressure.

1    16.   A vacuum system for a surgical cutting
2 device, comprising:
3       a pumping assembly that creates a flow of fluid;
4       an intake valve coupled to said pumping assembly;
5       an exhaust valve coupled to said pumping assembly;
6       an electrical controller that controls said intake
7 and exhaust valves to control the flow of fluid from
8 said pumping assembly.

002580.P001X          - 32 -        Patent Application

1      17.  A vacuum system for a surgical cutting

2  device, comprising:

3       a vacuum source;

4       a cutting device;

5       a valve housing that has an inlet port connected

6  to said cutting device and an outlet port connected to

7  said vacuum source;

8       a core that rotates within said valve housing,

9  said core contains an inner channel which periodically

10  become aligned with said inlet port and said outlet

11  port; and,

12       a motor that rotates said core.


1      18.  A surgical cutter, comprising:

2       an outer sleeve that has an aspiration port in

3  fluid communication with an inner channel;

4       an inner sleeve that moves within said inner

5  channel of said outer sleeve;

6       a solenoid assembly that moves said inner sleeve

7  within said inner channel; and,

8       a controller that drives said solenoid assembly.


1      19.  The surgical cutter as recited in claim 18,

2  wherein said solenoid assembly includes a first

3  solenoid that moves said inner sleeve in a first

002580.P001X          - 33 -       Patent Application

4  direction and a second solenoid that moves said inner

5  sleeve in an opposite second direction.

1        20.  A surgical cutter, comprising:

2        an outer sleeve that has a plurality of aspiration

3  ports in fluid communication with an inner channel;        *fig 19*

4  and,

5        an inner sleeve that moves within said inner

6  channel of said outer sleeve.


1        21.  A surgical cutter, comprising:

2        an outer sleeve that has an aspiration port in

3  fluid communication with an inner channel;

4        an inner sleeve that moves within said inner        *fig 20*

5  channel of said outer sleeve;

6        a transmitter that transmits a signal to said

7  outer sleeve; and,

8        a computer that processes the transmitted signal

9  to determine a location of said outer sleeve.

10/29/199    PRINT OF DRAWINGS    Pat. Illst. **    TO 17145573347    P.02
AS ORIGINAL/    FILED

08/739640



FIG. 6

FIG. 7

FIG. 8

# EXHIBIT E

| | Class | Subclass | ISSUE CLASSIFICATION |
|---|---|---|---|

UTILITY **SERIAL** **NUMBER** / **739640**   PATENT DATE   PATENT NUMBER

| SERIAL NUMBER<br>08/739,640 | FILING DATE<br>10/30/96 | CLASS<br>606 | SUBCLASS<br>*166* | GROUP ART UNIT<br>3309 | EXAMINER<br>*Thaler* |
|---|---|---|---|---|---|

APPLICANTS

ROD ROSS, LAGUNA NIGUEL, CA; GREGGORY HUGHES, FOUNTAIN VALLEY, CA; JAMES C. BOORE, POWAY, CA.

\*\*CONTINUING DATA\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
 VERIFIED

\*\*FOREIGN APPLICATIONS\*\*\*\*\*\*\*\*\*\*\*\*
 VERIFIED

**CPA**

FOREIGN FILING LICENSE GRANTED 04/24/97      \*\*\*\*\* SMALL ENTITY \*\*\*\*\*

| Foreign priority claimed<br>35 USC 119 conditions met | ☐ yes ☐ no<br>☐ yes ☐ no | AS<br>FILED | STATE OR<br>COUNTRY | SHEETS<br>DRWGS. | TOTAL<br>CLAIMS | INDEP.<br>CLAIMS | FILING FEE<br>RECEIVED | ATTORNEY'S<br>DOCKET NO. |
|---|---|---|---|---|---|---|---|---|
| Verified and Acknowledged    Examiner's initials | | ➡ | CA | 9 | 21 | 11 | $781.00 | 002580.P001X |

ADDRESS

BLAKELY SOKOLOFF TAYLOR & ZAFMAN
12400 WILSHIRE BOULEVARD
SEVENTH FLOOR
LOS ANGELES CA 90025

TITLE

APPARATUS AND METHOD FOR PERFORMING OPHTHALMIC PROCEDURES

U.S. DEPT. OF COMM./ PAT. & TM—PTO-436L  (Rev.12-94)

| PARTS OF APPLICATION<br>FILED SEPARATELY | | Applications Examiner |
|---|---|---|

| NOTICE OF ALLOWANCE MAILED | | CLAIMS ALLOWED |
|---|---|---|
| | Assistant Examiner | Total Claims   Print Claim |

| ISSUE FEE | | DRAWING |
|---|---|---|
| Amount Due   Date Paid | | Sheets Drwg.   Figs. Drwg.   Print Fig. |
| | Primary Examiner | ISSUE BATCH NUMBER |

| Label<br>Area | PREPARED FOR ISSUE |
|---|---|

**WARNING:** The information disclosed herein may be restricted. Unauthorized disclosure may be prohibited by the United States Code Title 35, Sections 122, 181 and 368. Possession outside the U.S. Patent & Trademark Office is restricted to authorized employees and contractors only.

Form PTO-436A
(Rev. 8/92)

Our Ref.: 002580.P001X

## DECLARATION AND POWER OF ATTORNEY

As a below named inventor, I hereby declare that:

My residence, post office address and citizenship are as stated below, next to my name,

I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled

### AN APPARATUS AND METHOD FOR PERFORMING OPHTHALMIC PROCEDURES

the specification of which

    ❑  is attached hereto.
    ■  was filed on <u>October 30, 1996</u> as
           Application No. <u>08/739,640</u> _____
           and was amended on _____
                           (if applicable)

I hereby state that I have reviewed and understand the contents of the above-identified specification, including the claims, as amended by any amendment referred to above. I do not know and do not believe that the same was ever known or used in the United States of America before my invention thereof, or patented or described in any printed publication in any country before my invention thereof or more than one year prior to this application, that the same was not in public use or on sale in the United States of America more than one year prior to this application, and that the invention has not been patented or made the subject of an inventor's certificate issued before the date of this application in any country foreign to the United States of America on an application filed by me or my legal representatives or assigns more than twelve months prior to this application.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56(a).

I hereby claim foreign priority benefits under Title 35, United States Code, Section 119, of any foreign application(s) for patent or inventor's certificate listed below and have also identified below any foreign application for patent or inventor's certificate having a filing date before that of the application on which priority is claimed:

| COUNTRY (OR INDICATE IF PCT) | APPLICATION NUMBER | DATE OF FILING (day, **month**, year) | PRIORITY CLAIMED UNDER 37 USC 119 | |
|---|---|---|---|---|
| | | | ❑ **YES** | NO ❑ |
| | | | ❑ **YES** | NO ❑ |
| | | | ❑ **YES** | NO ❑ |

002580.P001X

Page 1 of 3

I hereby claim the benefit under Title 35, United States Code, Section 120 of any United States application(s) listed below and, insofar as the subject matter of each of the claims of this application is not disclosed in the prior United States application in the manner provided by the first paragraph of Title 35, United States Code, Section 112, I acknowledge the duty to disclose material information as defined in Title 37, Code of Federal Regulations, Section 1.56(a) which occurred between the filing date of the prior application and the national or PCT international filing date of this application:

| APPLICATION NO. | FILING DATE | STATUS (PATENTED, PENDING, ABANDONED) |
|---|---|---|
| 08/660,520 | 06/07/96 | Pending |
| | | |

I hereby appoint BLAKELY, SOKOLOFF, TAYLOR & ZAFMAN, a firm including: Aloysius T.C. AuYeung, Reg. No. 35,432; William Thomas Babbitt, Reg. No. P39,591; Bradley J. Bereznak, Reg. No. 33,474; Michael A. Bernadicou, Reg. No. 35,934; Roger W. Blakely, Jr., Reg. No. 25,831; Kent M. Chen, Reg. No. P39,630; Thomas M. Coester, Reg. No. P39,637; William D. Davis, Reg. No. 38,428; Daniel M. De Vos, Reg. No. 37,813; Karen L. Feisthamel, Reg. No. P40,264; Scot A. Griffin, Reg. No. 38,167; David R. Halvorson, Reg. No. 33,395; Brian D. Hickman, Reg. No. 35,894; Eric Ho, Reg. No. P39,711; George W Hoover II, Reg. No. 32,992; Eric S. Hyman, Reg. No. 30,139; Jeff D. Jacobs, Reg. No. P40,029; Dag H. Johansen, Reg. No. 36,172; Stephen L. King, Reg. No. 19,180; Daniel C. Mallery, Reg. No. 33,532; Michael J. Mallie, Reg. No. 36,591; Kimberley G. Nobles, Reg. No. 38,255; Ronald W. Reagin, Reg. No. 20,340; James H. Salter, Reg. No. 35,668; William W. Schaal, Reg. No. 39,018; James C. Scheller, Reg. No. 31,195; Edward W. Scott IV, Reg. No. 36,000; Maria E. Sobrino, Reg. No. 31,639; Stanley W. Sokoloff, Reg. No. 25,128; Allan T. Sponseller, Reg. No. 38,318; David R. Stevens, Reg. No. 38,626; Edwin H. Taylor, Reg. No. 25,129; Lester J. Vincent, Reg. No. 31,460; John Patrick Ward, Reg. No. P40,216; Ben J. Yorks, Reg. No. 33,609; and Norman Zafman, Reg. No. 26,250; my attorneys; and Roland B. Cortes, Reg. No. 39,152; Gary B. Goates, Reg. No. 35,159; Thomas X. Li, Reg. No. 37,079; and Edwin A. Sloane, Reg. No. 34,728; my patent agents, with offices located at 12400 Wilshire Boulevard, 7th Floor, Los Angeles, California 90025, telephone (310) 207-3800, with full power of substitution and revocation, to prosecute this application and to transact all business in the Patent and Trademark Office connected herewith.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

Full Name of Sole/First Inventor _____ Rod Ross _____

Inventor's Signature _____ *Rod Ross* _____ Date *1-7-1997*

Residence _____ Laguna Niguel, California _____ Citizenship _____ U.S.A. _____
          (City,    State)                                     (Country)

Post Office Address _____ 103 Fairlane Road _____
                          Laguna Niguel, California 92677

002580.P001X

Page 2 of 3

Full Name of Second/Joint Inventor ___Greggory Hughes_____

Inventor's Signature __*[signature]*__ Date _1/7/97_

Residence ___Fountain Valley, California_____ Citizenship ___U.S.A.___
            (City,    State)                                   (Country)

Post Office Address _____16729 Silktree Street_____
                            Fountain Valley, California 92708_____


Full Name of Third/Joint Inventor ___James C. Boore_____

Inventor's Signature __*[signature]*__ Date _1/7/97_

Residence ___Poway, California_____ Citizenship ___U.S.A.___
            (City,    State)                                   (Country)

Post Office Address _____12645 Treehill Place_____
                            Poway, California 92064_____