# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SCIERAN TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-1319 (SLR) |
| | ) | |
| v. | ) | |
| | ) | |
| BAUSCH & LOMB INCORPORATED, | ) | |
| | ) | |
| Defendant. | ) | |

## BAUSCH & LOMB'S RESPONSES TO
## SCIERAN'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant Bausch & Lomb Incorporated ("B&L") hereby responds to Plaintiff Scieran Technologies, Inc.'s ("Scieran") First Set of Interrogatories.

### GENERAL OBJECTIONS

These General Objections are incorporated by reference into each response below.

1.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it seeks to impose burdens or obligations beyond or inconsistent with those required by the Federal Rules of Civil Procedure or the Local Rules of the U.S. District Court for the District of Delaware.

2.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it seeks privileged information, including information protected by the attorney-client privilege, the work product doctrine, the common interest privilege, or any other applicable privilege or immunity.

3.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it is overbroad and unduly burdensome.

4.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it seeks information that is neither relevant to any claim or defense of any party nor reasonably calculated to lead to the discovery of admissible evidence.

5.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it seeks confidential information of third parties.

6.    B&L objects to each interrogatory, and to each definition and instruction, to the extent it seeks information about all products that include an inner cutter, because only products with a pre-bent inner cutter and a slit have been accused of infringement.

7.    B&L objects to the definition of "Bausch & Lomb Incorporated," "Bausch & Lomb," "you" and "your" as overbroad.

8.    B&L objects to Definition number 9.  B&L does not understand what "Computer Motion" and "Intuitive" have to do with this case.

### RESPONSES TO INTERROGATORIES

INTERROGATORY NO 1:

State in detail the particulars of the design, development, and/or origination of the inner cannula used or designed to be used in each of your disposable high-speed vitrectomy cutters, that have been made, sold, offered for sale by you or authorized by you to be made, sold, or offered for sale.  When stating in detail the particulars you should the identity [sic] of all persons involved in or having knowledge of the development of each of the inner cannulas.

RESPONSE:

Subject to the General Objections, B&L responds that Noetix or Promex (collectively "Promex") designed and developed the inner cutters used in B&L's CX4804 and CX5825 Lightning cutter tips, in or about 1994.  B&L refers to the documents produced by Promex, including 51490-51547 and 51768-83, which provide information about the design and development of the inner cutters used in B&L's CX4804 and CX5825 Lightning cutter tips (as

well as the inner cutters used in the Diskecter). Persons involved in or having knowledge of such development include Michael Miller, Joe Mark, Alan Schechter, Dan Gray, Dan Ireland and Kirk Miller, as well as Rod Ross, who received prototypes in 1994 or 1995.

INTERROGATORY NO. 2:

Identify each of your products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter that have ever been manufactured, offered for sale, or sold by you. For each such product, identify the product number, identify its date of manufacture, dates of offer for sale, and/or dates of sale, identify all persons involved in or having knowledge of the development of each of the products.

RESPONSE:

Subject to the General Objections, B&L identifies its CX4804 and CX5825 Lightning cutter tips. B&L further responds that it began selling the CX4804 in 1998, and the CX5825 in 2002. Pursuant to Fed. R. Civ. P. 33(d), B&L refers to B&L 2469-2736 and 5456-5557, which show sales of these cutter tips. Persons having the most knowledge about the development of these products include current and former employees of Promex, including those identified in response to interrogatory no. 1.

INTERROGATORY NO. 3:

State in detail the particulars of the first instance that you received notice of each of the patents of Scieran's patents-in-suit. Include in your answer the identity of the person or persons who received such notice, the dates each such notice [sic] and state in detail the particulars of any actions that were taken by you as a result of receiving such notice.

RESPONSE:

Subject to the General Objections, pursuant to Fed. R. Civ. P. 33(d), B&L will produce responsive, non-privileged documents (B&L 6074-6115) from which the answer may be derived or ascertained.

INTERROGATORY NO. 4:

Identify each advertisement, including catalogs, ever made for each of your products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter ever manufactured, offered for sale, or sold by you or authorized by you to be manufactured, offered for sale, or sold. When identifying each advertisement, you should include the identity of the dates of each advertisement, identity [sic] the publisher or broadcaster of each advertisement, and the cost to Bausch & Lomb for each advertisement.

RESPONSE:

In addition to the General Objections, B&L objects to identifying the dates of each advertisement, the publisher or broadcaster of each advertisement and the cost to B&L for each advertisement because it would be unduly burdensome and because such information is not relevant to the claim or defense of any party. Scieran's counsel has advised the Court that Scieran is not seeking discovery of such cost information (May 3, 2005 Disc. Conf. Tr. at 18). Subject to these objections, pursuant to Fed. R. Civ. P. 33(d), B&L has produced responsive, non-privileged documents that it is able to locate in a reasonable search from which the answer may be derived or ascertained with respect to the CX4804 and CX5825 Lightning cutter tips (B&L 426-630).

INTERROGATORY NO. 5:

Identify each retailer, distributor, and person to whom Bausch & Lomb has ever sold or has offered to sell each product that includes an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter. For each retailer, distributor, and person, identify the products each such retailer, distributor, and person purchased, state the date of each purchase, and state the unit and dollar amount of such purchases adjacent the product identifier. When identifying each retailer, distributor and person, you should include the name(s) of each person from each such retailer, distributor and person with whom Bausch & Lomb dealt and the address(es) and phone number(s) of each such retailer, distributor and person.

RESPONSE:

In addition to the General Objections, B&L objects to identifying each retailer, distributor and person (including names and addresses), and to identifying all products each such

customer purchased, because such information is not relevant to the claim or defense of any

party, because it would be burdensome to do so, and because the identity of B&L's customers is

confidential. Subject to these objections, pursuant to Fed. R. Civ. P. 33(d), B&L refers to B&L

2469-2736 and 5456-5557, which show sales of the CX4804 and CX5825 Lightning cutter tips.

INTERROGATORY NO. 6:

        Identify all of Bausch & Lomb's outside vendors, including material suppliers, service companies, manufacturers and sub-manufacturers, independent contractors, tool and die makers, and marketing/advertising agencies with whom Bausch & Lomb has ever consulted or from whom Bausch & Lomb ever obtained services or materials in connection with the use, manufacture or advertisement, sale, or offer for sale of each of Bausch & Lomb's products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter. When identify [sic] all of Bausch & Lomb's outside vendors, you should include the name(s) of each person from each outside vendor with whom you dealt, the dates on which you dealt with each outside vendor, the material or service purchased and/or the topic of consultation and the address(es) and phone number(s) for each outside vendor.

RESPONSE:

        In addition to the General Objections, B&L objects to this interrogatory because it

seeks information not relevant to the claim or defense of any party, and because it would be

burdensome to provide such information, and because it contains no time limitation. Subject to

these objections, B&L responds that Promex is its outside vendor for the CX4804 and CX5825

Lightning cutter tips. Pursuant to Fed. R. Civ. P. 33(d), B&L has also produced documents from

which the answer may be derived or ascertained with respect to Promex.

INTERROGATORY NO. 7:

        State all facts that support Bausch & Lomb's contention made in its First Affirmative Defense and Claim of Non-infringement that Bausch & Lomb has not infringed the '111 or '986 patents. Include in your answer the identity of each element or limitation of each claim of the patents that are not present in Bausch & Lomb's products and the functional or structural differences between Bausch & Lomb's product and the elements or limitations of each claim. Also in your response, identify all individuals or witnesses having knowledge of any such fact and identify all documents that refer, relate, support, or evidence any such fact.

RESPONSE:

      Subject to the General Objections, B&L states that an invalid patent claim cannot be infringed, and that all of the asserted claims of the '111 and '986 patents are invalid for numerous reasons, including that the claimed inventions were not made by the named inventors, but were made by Promex, and were on sale in the United States for years before the applications for the '111 and '986 patents. Indeed, if (as Scieran alleges) the accused CX4804 and CX5825 devices infringe, it necessarily follows that the asserted claims are invalid because the accused devices are the same as prior art devices made and sold by Promex. See B&L's response to interrogatory no. 8. As set forth in that response, if Mr. Miller's invention of the Diskecter is not invalidating prior art, then there is no infringement.

INTERROGATORY NO. 8:

      State all facts that support Bausch & Lomb's contention, made in its Second Affirmative Defense, and Claim of Invalidity that the '111 or '986 patents are invalid under the Patent Laws of the United States including without limitation 35 U.S.C. §§ 101, 102(a) through 102(g), 103, and 112. Include in your response your interpretation of the scope of the claims of the '111 and '986 patents and the identity of all prior art, if any, that Bausch & Lomb alleges renders the patents invalid. Also include in your response, a detailed description of how each alleged prior art reference renders each claim of the '111 and '986 patents invalid including reference and discussion of how each section of Title 35 you assert applies thereto. Also in your response, identify all individuals or witnesses having knowledge of any such fact and identify all documents that refer, relate, support, or evidence any such fact.

RESPONSE:

      Subject to the General Objections, B&L responds that the asserted claims of the '111 and '986 patents are invalid for numerous reasons, including the following:

      A.    Promex's Prior Invention and the Diskecter

      It is black-letter law that "that which infringes if later, anticipates if earlier." Here, the products accused of infringement were in fact invented and developed by Promex, used in commercial products, and disclosed to Scieran, long before the October 3, 1997 priority date

of the applications for the '111 and '986 patents and long before Scieran's asserted December 1996 conception date. Moreover, the accused devices are the same as the prior art Diskecter. If the Diskecter is not invalidating prior art, then there is no infringement.

The asserted claims of the '986 and '111 patents are invalid because, years before Scieran's alleged invention, Michael Miller of Promex invented a surgical device that meets every limitation of claim 3 of the '111 patent and claims 1-4 of the '986 patent. That device had an outer sleeve with an inner surface and an aspiration port which was in fluid communication with an inner channel of the outer sleeve, and an inner sleeve located within the inner channel of the outer sleeve. The inner sleeve had a tip with a circumferential slit and a preexisting bend about the slit toward the aspiration port. The tip was bent before the inner cutter was inserted into the outer sleeve, and the tip exerted a spring force on the inner surface of the outer sleeve. Mr. Miller's surgical device also had a motor that moved the inner sleeve relative to the outer sleeve.

Scieran has acknowledged that its earliest conception date is December 1996. Mr. Miller made his invention, which was first commercialized as the Diskecter, long before that. Mr. Miller began to develop a device to cut and remove tissue from the spine in 1992. This device was commercialized by 1994 as the Diskecter. Mr. Miller came up with the idea of a "living" hinge (formed by circumferentially slitting the tip of the inner cutter) to close the gap between the inner and outer cutters, so tissue could be cut cleanly (see 51518-25, Miller's 1993 lab notebook). In late 1993, after finding that commercially-built parts with the living hinge did not cut well, Mr. Miller bent the inner cutter to eliminate the gap between the blades. Dan Gray of Promex studied the amount of bend that was necessary (see 51539-44, April 1994 lab notebook). Mr. Miller's lab notebook also discloses a bent inner cutter as of December 11, 1995

(*see* 51536). Mr. Miller told others at Promex, including Alan Schechter, Joe Mark, Dan Gray and Dan Ireland, about his invention. Thus, the asserted claims of the '111 and '986 patents are invalid under 35 U.S.C. § 102(g).

Current and former employees of Promex (including Messrs. Miller, Gray and Mark, and Dr. Schechter) will testify that Mr. Miller conceived of the circumferentially slitted inner cutter with a pre-bent tip that was incorporated into the Diskecter. Promex also has x-rays of a Diskecter, which show that it had an inner cutter with a circumferential slit and a pre-bent tip. In short, the Miller invention was conceived and reduced to practice long before Scieran's alleged conception of the claimed invention of the '111 and '986 patents. These facts render all of the asserted claims invalid under 35 U.S.C. § 102(g).

The Diskecter device sold by Promex to Sofamor Danek from 1994 to 1997 had an inner cutter with a circumferential slit and a pre-bent tip. At least by 1994, Mr. Gray had created assembly instructions for the Diskecter, which show that the inner cutter was pre-bent (50005, *see also* 50002-12). Mr. Gray bent the inner cutter using a V-block that Promex still has (*see also* 50000-1, June 1995 bend fixture drawings). Promex sold the Diskecter device to Sofamor Danek from 1994 to 1997 (*see, e.g.*, 50164-72). Those sales render the asserted claims of the patents-in-suit invalid under 35 U.S.C. § 102(b).

B.    The Vit Commander

In 1994, Promex created the "Vit Commander" for use in vitrectomy procedures. The Vit Commander is a smaller version of the Diskecter, and meets every limitation of the asserted claims of the '111 and '986 patents for the reasons explained above.

After meeting with Dr. Schechter, Messrs. Ross and Boore formed Scieran Technologies, Inc. for the purpose of marketing the Vit Commander (*see, e.g.*, 51594, 1/19/95 ltr

Ross to Schechter ("you are giving Chris Boore and I your approval and commitment to pursue the technology developed by Noetix to form a company and market the high speed vitrectomy cutter we have named the Vit Commander System.").

Dr. Schechter gave prototypes of the Vit Commander cutter to Mr. Ross to assist with Scieran's marketing efforts. Current and former Promex employees will testify that these prototypes (which Promex still has) had an inner cutter with a circumferential slit and a pre-bent tip. Scieran admitted in its February 1995 business plan that the Vit Commander was based on the Diskecter technology – which, as described above, had an inner cutter with a circumferential slit and a pre-bent tip (*see* 51725-42 at 7-8 ("The Micro-Endo Diskecter System utilizes the same cutting technology licensed by Scieran Technologies."); *id.* at 16 ("Scieran has contracted with Noetix to manufacture the Vit Commander System at the same manufacturing facility it produces the device for Danek.")). Thus, the asserted claims of the '111 and '986 patents are invalid under 35 U.S.C. § 102(f) because they were derived from the work of others and were not invented by the named inventors.

In addition, Scieran's 1995 activities with the Vit Commander constituted invalidating public uses under § 102(b). For example, Dr. Paul Tornambe created a videotape showing the Vit Commander in surgery. According to Scieran, the videotape "has been utilized since June 1995" (*see* Scieran June 1995 Marketing Plan, 51665-72 at 51667-68 ("Business Reply Cards will be included in our direct mail pieces allowing surgeons to request a copy of the promotional video. Every sales representative will also have copies of the tape for presentation purposes."); *see also* 51620-21, 6/8/95 ltr from Ross to Robert King, enclosing videotape).

The Vit Commander was also presented at various conferences in 1995. As Scieran's September 1996 Business Plan explained, Dr. Tornambe presented the Vit Commander

at the September 1995 Retina Society Meeting in Santa Fe and Drs. William Mieler and Dennis Han presented it at the 1995 A.A.O. meeting in Atlanta (ST 1408).

Many surgeons used the Vit Commander in surgery in 1995. For example, Mr. Ross told Mr. Mark in May 1995 that Drs. Tornambe, McBeath, and Melgen had all used the Vit Commander, and that "we have even taken the device to a group of vitreoretinal surgeons in the Southeast who perform approximately 3,000 posterior vitrectomies per year" (*see* 51710-12; *see also* 51632, 7/7/95 fax from Ross to Mark re surgical demos with Wayne Fung and Edward McLean; *see also* 51661, 3/12/95 fax from Ross to Schechter re Dr. Melgen). And, according to Scieran's June 1995 Marketing Plan, some Independent Representatives "have already witnessed the Vit Commander System used in surgery. As the Scieran management team has traveled to different cities, the local NOA affiliate has been invited to observe surgery..." (51668; *see also* 51672, June 1995 Marketing Plan, Dr. Soares "will be publishing a paper based on quantitative analysis performed in surgery to measure the difference between the cutting ability of the pneumatic cutters and the Vit Commander System.").

Since 1998, Scieran's own website stated that Dr. Tornambe had used the Vit Commander in surgery since at least 1995 (B&L 33, 44-45; *see also* ST 1389 (article dated December 1, 1997, stating that Dr. Tornambe "helped develop the device and has been using it for the past 2 years.")). Scieran's website also explained that Dr. McBeath used a prototype of the Vit Commander in 1994, in pig eyes (ST 1383-84). By 1995, Dr. McBeath had also tested the Vit Commander in FDA-approved laboratory animal studies and human surgical evaluations (*see* 51634-37, 1995, Ocular Surgery News). These numerous presentations and demonstrations of the Vit Commander are public uses that invalidate the asserted claims under at least 35 U.S.C. § 102(b).

C.    The Storz MicroVit

The asserted claims of the '986 patent are also invalid under 35 U.S.C. § 102(b) because of Storz' sales (since at least 1993) of its MicroVit cutter, which meets every limitation of claims 1-4 of the '986 patent. The MicroVit was a surgical device that had an outer sleeve with an inner surface and an aspiration port which was in fluid communication with an inner channel of the outer sleeve. It had an inner sleeve located within the inner channel of the outer sleeve. The inner sleeve had a tip that had a longitudinal slit and a preexisting bend about the slit toward the aspiration port, so that the tip exerted a spring force on an inner surface of the outer sleeve. The preexisting bend was made by flaring the tip of the inner cutter, which bent it upward. When the pre-bent inner cutter was placed into the outer needle, the bend created a spring force between the flared portion of the inner needle and the inside of the outer needle, and caused the flared portion to collapse slightly so the top portion of the inner cutter was forced up against the inside of the outer cutter. As such, the MicroVit anticipates the asserted claims of the '986 patent.

D.    Prior Art Patents

1.    Claim 3 of the '111 patent

Claim 3 of the '111 patent is invalid as obvious in light of U.S. Patent No. 5,782,849 to Miller, which is prior art under 35 U.S.C. § 102(e), in combination with U.S. Patent No. 5,047,008 to de Juan or U.S. Patent No. 5,019,035 to Missirlian, which are prior art under § 102(b). Miller discloses a surgical device having a motor that reciprocates an inner cutting member inside an outer tubular member that has a cutting opening (col. 4, ll. 13-15; *id.* at ll. 19-25). The outer tubular member has an aspiration port, through which cut tissue is drawn into an aspiration passageway in the inner cutting member (col. 2, ll. 36-39; col. 5, ll. 23-25). A

circumferential slot or hinge is formed in the inner cutting member, creating a cutting head

portion and a body portion (col. 2, ll. 26-28 ("A diametrical slot is defined in the cannula to form

a hinge segment separating the cutting heads and body portions of the cutting member.")).  When

the inner cutting member contacts tissue during use, its cutting head portion pivots at the hinge

and is pressed against the outer cutter (col. 2, ll. 22-25; *id.* at ll. 41-50 ("Resistance from the

tissue causes the cutting head to pivot about the hinge to form an essentially zero clearance

between the cutting head and the cutting opening in the outer cannula.")).

      Miller discloses that the "particular benefit" (col. 4, l. 59) of such a

circumferential slit is to facilitate cutting by closing the gap between the inner and outer

members (col. 5, ll. 13-20):

> Once the cutting head 43 contacts the tissue it pivots so that the
> cutting edge 22 forms a zero clearance interface with the cutting
> edge 18 of the outer cannula cutting opening 14.  This zero
> clearance facilitates cutting the tissue segment T1, completely
> severing a strand of tissue between the inner and outer cannulae.
> This feature eliminates the gap, typically exists between the cutting
> edges of the prior art devices.

One of ordinary skill in the art would understand that the creation of zero clearance between the

inner and outer members means that the cutting head exerts a spring force on the inside of the

outer sleeve.

      The '008 patent to de Juan, which was not before the Examiner during

prosecution, discloses a surgical device with "an outer needle containing an aperture and an inner

hollow tubular member having a cutting blade on one end which is reciprocated within the outer

needle" (col. 2, ll. 29-32).  The outer needle has an aspiration port in fluid communication with

the inner channel.  A slot is cut into the blade on the side opposite the cutting edge, and the tip of

the blade is flared into an elliptical shape, before being placed into the outer needle (col. 5, ll. 20-

23, 31-32). This flare causes the tip to exert a spring force against the inside of the outer sleeve (col. 5, ll. 37-42) ("[T]he force created by the inner tubular member attempting to form an elliptical shape inside a round tube will cause the cutting edge 37 of the blade 36 to precisely take the round cross-section of the corresponding part of the outer tube…causing a tight shearing action."). De Juan also discloses achieving "tight shearing action" by using a slightly bent blade, as shown in figures 8-10, which is angled upward towards the aspiration port:

> When blade insert 70 is inserted into needle 18, angle portion 72 will press against the inner wall of needle 18, thereby creating sufficient spring tension to hold the blade insert 70 into substantial conformity with the inner diameter of the outer needle 18 to create a tight shearing action across aperture 20 (col. 5, ll. 58-63).

(*See also* U.S. Patent No. 4,696,298 to Higgins, which discloses flaring the end of the inner cutting member into an elliptical shape to achieve a spring tension that holds the cutting blade into conformity with the inner diameter of the outer member (*e.g.*, col. 5, ll. 41-60; *see also* RE 33,258 to Onik, col. 3, ll. 57-61 (same); *see also* U.S. Patent No. 5,050,204 to Lawson (disclosing a flared inner cutter, so when the inner cutter "reciprocates, there is an outward radial force from the inner needle end 21 on the outer needle inner diameter 73, based on the deflection of the inner needle end 21 in order to create the interference fit within the outer needle diameter 73. The outer radial force F causes the inner needle 20 to press more firmly against the inner diameter 73 of the outer needle 70" (col. 4, ll. 1-8; *id*. at ll. 13-25)).

The '035 patent to Missirlian discloses a guillotine cutting device having a motor that reciprocates an inner cutter inside an outer cutter to cut tissue. The outer cutter has an inner surface, and an aspiration port in fluid communication with an inner channel (col. 3, ll. 32-36). Missirlian discloses a pre-bent inner sleeve that exerts a spring force against the inside of the outer sleeve to ensure clean and efficient cutting:

13

The cutting probe assembly 42 provides for efficient and clean cutting action while substantially minimizing or avoiding pulling or tearing on the drawn-in vitreous material. Towards the foregoing ends, the inner cutting member 44 has a distal end portion 78 which is bent at a critical angle relative to its longitudinal axis 80 so that the cutting edge 44a is preferably engaged with respect to the inner walls 82 adjacent the cutting edge 48a of the outer cutting member 46, but can also be slightly spaced therefrom. The inclined distal end portion 78 is provided with a resilient or spring-like property which facilitates maintaining the cutting edge 44a in a proper cutting orientation relative to the cutting edge 48a (col. 4, ll. 40-53; *see also* col. 2, ll. 13-20).

Other prior art patents also disclose pre-bending the inner cutter for better cutting (*see* U.S. Patent No. 4,655,743 to Hyde, col. 2, ll. 56-58; col. 5, ll. 7-11); *see also* U.S. Patent No. 5,669,923 to Gordon (col. 6, ll. 31-36)).

Together, Miller and de Juan disclose every element of claim 3 of the '111 patent. Miller discloses a surgical device with a motor that moves an inner sleeve ("inner cutting member") within an outer sleeve ("outer tubular member"). The outer sleeve has an aspiration port in fluid communication with an inner channel of the outer sleeve. Miller also discloses an inner sleeve that is located within an inner channel of the outer sleeve, where the inner sleeve has a tip (called a "cutting head portion") that has a circumferential slit (also called a hinge). Miller also discloses the that cutting head of the inner cutter bends during cutting, and when it bends, it exerts a spring force on the inside of the outer sleeve. Both de Juan and Missirlian, and others, disclose bending the inner cutter before it is inserted into the outer cutter, so the inner cutter presses up against, and exerts a spring force against, the inside of the outer sleeve. De Juan explicitly discusses that spring tension is necessary for efficient cutting, and that the pre-bent tip exerts a spring force on an inner surface of the outer sleeve.

There was a suggestion or motivation in the prior art to combine a circumferential slit with a pre-bent tip. One of the problems addressed by the prior art was how to create a "tube-within-a-tube" minimally invasive surgical device that cleanly and efficiently cut tough tissue (*see, e.g.,* '849 to Miller, cols. 1-2, col. 4, ll. 47-51; '035 to Missirlian, cols. 1-2; '204 to Lawson, cols. 1-2). Miller, for example, described this problem (col. 4, l. 62 – col. 5, l. 7):

> It is known that as a reciprocating cutter engages and attempts to sever tissue T drawn into the cutting opening the tissue inherently resists the cutting action. As a portion of tissue T1 is being severed, it exerts a reactive force F against the cutting edge 22 of the inner cannula 20. In a typical tube within a tube reciprocating cutter, this reactive or resistive force F is withstood by the cannula without any significant bending or movement of the solid inner cannula. Thus, with prior devices the clearance between the cutting edge remains constant, which permits a strand of tissue to remain in the gap between the inner and outer tubes. Frequently, the tissue is not excised on the first stroke of the cutting blade.

The prior art teaches that this problem may be solved by eliminating the gap between the inner and outer sleeves in a guillotine cutting device (*e.g.,* '849 to Miller, col. 2, ll. 45-50; col. 5, ll. 10-27; col. 7, ll. 28-32); in other words, by having the inner cutting member exert a spring force against the outer member (U.S. Pat. No. 4,696,298 to Higgins, col. 5, ll. 41-60; '008 to de Juan, col. 5, ll. 32-42, ll. 58-63; '035 to Missirlian, col. 4, ll. 40-53; '204 to Lawson, col. 2, ll. 14-20).

The prior art teaches different ways of having the inner cutter exert such a spring force. For example, U.S. Pat. No. 4,696,298 to Higgins discloses slitting the end of the inner cutting member and flaring it into an elliptical shape to achieve a spring tension (*e.g.,* col. 5, ll. 41-60):

> In this regard, sufficient expansion in the elliptical direction is necessary to achieve a spring tension to hold the cutting blade into substantial conformity with the inner diameter of the outer needle,

but excessive spread will cause excessive spring tension. The spring tension results from the compression experienced by the tubular blade 36 when it is installed in the outer tube 18 after the blade 36 has been flared.

Another example is the '204 patent to Lawson, which discloses oversizing the outer diameter of the tip of the inner cutter, so "when the inner needle 21 reciprocates, there is an outward radial force from the inner needle end 21 on the outer needle inner diameter 73…The outer radial force F causes the inner needle 20 to press more firmly against the inner diameter 73 of the outer needle 70" (col. 4, ll. 1-8).

Other prior art patents teach pre-bending the inner cutter to close the gap between the inner and outer cutters. Missirlian discloses pre-bending the tip of the inner cutter "so that the cutting edge 44a is preferably engaged with respect to the inner walls 82 adjacent the cutting edge 48a of the outer cutting member 46…" (col. 4, ll. 46-49; *see also* U.S. Pat. No. 4,655,743 to Hyde, col. 5, ll. 7-11 ("The inner cannula 33 is springedly bent in a V configuration at location 40 such that the inner cannula 33 is urged or biased against the exterior cannula lumen 32 at both the bend location 40 and near the operative end 36.")).

It was also well-known that slitting the inner cutter would create "zero clearance" between the inner and outer cutters, as was disclosed in '849 to Miller (*see infra*; *see also* U.S. Pat. No. 3,815,604 to O'Malley, disclosing a longitudinal slit in the inner cutter to permit "the inner tube to be sprung out slightly so that the sharpened end of the inner tube is pressed tightly against the inner surface of the outer tube thereby insuring a good shearing action when the sharp end of the inner tube passes the port opening in the outer tube" (col. 2, ll. 61-66; col. 8, ll. 5-9)).

That a person skilled in the art would have had a suggestion or motivation to combine a slit with a pre-bent inner tip is further demonstrated by the fact that Mr. Miller pre-

bent the tip of his circumferentially slitted inner cutter, and his company sold the Diskecter, a surgical device having an inner cutter with a circumferential slit and a pre-bent tip, long before the priority date of the '111 patent. Such an inner cutter is shown by Mr. Gray's 1994 notebook and Mr. Miller's 1995 notebook. He incorporated the same technology on a smaller scale in the Vit Commander (which is prior art at least as to Mr. Ross under 35 U.S.C. § 102(f) because it was disclosed to him by Noetix). Storz had also developed the MicroVit, which, as explained above, had an inner cutter with a longitudinal slit that is flared to exert a spring force against the inside of the outer cutter.

    2. Claims 1 and 2 of the '986 patent

       Claims 1 and 2 are anticipated by the '008 patent to de Juan, which was not before the Examiner during prosecution, and which is prior art under 35 U.S.C. § 102(b). De Juan discloses a surgical device with "an outer needle containing an aperture and an inner hollow tubular member having a cutting blade on one end which is reciprocated within the outer needle" (col. 2, ll. 29-32). The outer needle has an aspiration port in fluid communication with the inner channel. A slot is cut into the blade on the side opposite the cutting edge, and the tip of the blade is flared into an elliptical shape, before being placed into the outer needle (col. 5, ll. 20-23, 31-32). This flare causes the tip to exert a spring force against the inside of the outer sleeve (col. 5, ll. 37-42) ("[T]he force created by the inner tubular member attempting to form an elliptical shape inside a round tube will cause the cutting edge 37 of the blade 36 to precisely take the round cross-section of the corresponding part of the outer tube...causing a tight shearing action."). De Juan also discloses achieving "tight shearing action" by using a slightly bent blade, as shown in figures 8-10, where the blade is angled upward towards the aspiration port:

       When blade insert 70 is inserted into needle 18, angle portion 72
       will press against the inner wall of needle 18, thereby creating

sufficient spring tension to hold the blade insert 70 into substantial conformity with the inner diameter of the outer needle 18 to create a tight shearing action across aperture 20 (col. 5, ll. 58-63).

(*See also* U.S. Patent No. 4,696,298 to Higgins, which discloses flaring the end of the inner cutting member into an elliptical shape to achieve a spring tension that holds the cutting blade into conformity with the inner diameter of the outer member (*e.g.*, col. 5, ll. 41-60; *see also* RE 33,258 to Onik, col. 3, ll. 57-61 (same); *see also* U.S. Pat. No. 5,050,204 to Lawson (disclosing a flared inner cutter, so when the inner cutter "reciprocates, there is an outward radial force from the inner needle end 21 on the outer needle inner diameter 73, based on the deflection of the inner needle end 21 in order to create the interference fit within the outer needle diameter 73. The outer radial force F causes the inner needle 20 to press more firmly against the inner diameter 73 of the outer needle 70" (col. 4, ll. 1-8; col. 4, ll. 13-25)).

De Juan, therefore, discloses every element of claims 1 and 2 of the '986 patent. De Juan discloses a surgical device with an outer sleeve that has an aspiration port in fluid communication with an inner channel, and an inner sleeve that is located within the inner channel of the outer sleeve. The '008 patent further discloses a slit in the inner sleeve, and a tip that has a pre-existing bend – a flare – about the slit toward the aspiration port in the outer cutter. De Juan explicitly discusses that spring tension is necessary for efficient cutting, and that the pre-bent tip exerts a spring force on an inner surface of the outer sleeve.

Miller and Missirlian, alone or in combination, also render claims 1 and 2 of the '986 patent invalid under 35 U.S.C. §§ 102 or 103. Miller anticipates claims 1 and 2 because, as described above, it discloses a surgical device having an outer sleeve with an inner surface and with an aspiration port in fluid communication with an inner channel, an inner sleeve within an inner channel of the outer sleeve, and a slit in the inner sleeve. Miller also discloses a

longitudinal slot, which extends from the cutting edge of the inner cutting member to the circumferential slot (col. 2, ll. 63-66, col. 3, ll. 1-3). There is a pre-existing bend about the longitudinal slot so that the tip of the inner cutting member exerts a spring force on an inner surface of the outer sleeve:

> Alternatively, the cutting head 72 can be preformed so that the cutting head is expanded into contact with the outer cannula when the cutting instrument is assembled (col. 7, ll. 15-18).
>
> ***
>
> The longitudinal slot 78 can be preformed with the slot expanded so that the cutting head has a diameter greater than the rest of the inner cutting cannula. Thus further ensures a zero clearance at the cutting interface between inner and outer cutting edges (col. 7, ll. 28-32).

Miller, therefore, discloses every element of claims 1 and 2 of the '986 patent, namely, a surgical device having an outer sleeve that has an aspiration port in fluid communication with an inner channel; and an inner sleeve within an inner channel of the outer sleeve, where the inner sleeve has a slit and a tip with a pre-existing bend about the slit toward the aspiration port, so that the tip exerts a spring force on an inner surface of the outer sleeve.

Moreover, Missirlian, as discussed above, discloses a pre-existing bend in the inner cutter. Both Miller and Missirlian explain that they are trying to achieve clean and efficient cutting by reducing the clearance between the cutting edges of the inner and outer cutters (*see, e.g.,* Miller, col. 2, ll. 63-66; col. 3, ll. 1-3; Missirlian, col. 1, ll. 43-45; col. 4, ll. 40-49). Because Missirlian discloses pre-bending the inner cutter so that the tip of the inner sleeve exerts a force on an inner surface of the outer sleeve, Miller and Missirlian in combination render claims 1 and 2 of the '986 patent obvious.

Claims 1 and 2 of the '986 patent would also be rendered obvious in light of Miller, de Juan and Missirlian. The motivation to combine such references is described above (p15-17).

### 3.    Claim 3 of the '986 patent

Claim 3 of the '986 patent is anticipated at least by Miller, Missirlian, and de Juan. As discussed above, these patents each disclose surgical devices with an outer sleeve that has an inner surface, an aspiration port in fluid communication with an inner channel, and an inner sleeve that is located in an inner channel of the outer sleeve. All disclose a means for having the tip of the inner sleeve exert a spring force on the inner surface of the outer sleeve. Miller discloses a circumferential slit that bends when in contact with tissue, which exerts a spring force against the inside of the outer sleeve. Miller further discloses a preformed longitudinal slit that makes the inner cutting member have a diameter greater than the inner diameter of the outer sleeve, so that a spring force is exerted against the inside of the outer sleeve. Missirlian similarly discloses bending the inner cutter. De Juan also discloses slitting and flaring the inner cutter to create spring tension (*see, e.g.*, figure 8). As discussed above (p15-17), one of ordinary skill in the art would have had a motivation to combine such references.

### 4. Claim 4 of the '986 patent

Claim 4 depends from claim 3, and specifies that the means to exert a spring force include a slit located adjacent to a pre-existing bend. For the reasons discussed above in connection with claim 1 of the '986 patent, de Juan, and Miller (alone or in combination with Missirlian), discloses an outer sleeve with an inner surface and an aspiration port in fluid communication with an inner channel, and an inner sleeve with a tip that exerts a spring force on the inner surface of the outer sleeve by a slit located adjacent to a pre-existing bend. As

discussed above (p15-17), one of ordinary skill in the art would have had a motivation to combine such references.

      E.     Other Obviousness Combinations

As set forth above, Mr. Miller's invention, embodied in the Diskecter and the Vit Commander devices, each anticipate the asserted claims of the '111 and '986 patents. (As noted above, the Vit Commander is prior art as to Mr. Ross under 35 U.S.C. § 102(f) because it was disclosed to him by Noetix.) If those devices were found to practice any element of any of the asserted claims, however, the devices would still render the asserted claims obvious in combination with the other prior art set forth above.

      F.     Written Description

Claim 3 of the '111 patent is invalid for failure to meet the written description requirement of 35 U.S.C. § 112. Claim 3 requires that the inner sleeve have "a tip that has a circumferential slit and a preexisting bend before insertion into said outer sleeve so that said tip exerts a spring force on said outer sleeve." The specification of the '111 patent does not disclose any device with a tip with a circumferential slit and a pre-existing bend.

The only disclosures in the '111 patent of an inner sleeve with a circumferential slit are in figures 6 and 7. These figures do not, however, show a tip with a pre-existing bend (*see* col. 6, ll. 42-46 ("The inner sleeve 104 has a circumferential slit 112 that allows the distal end of the sleeve 104 to bend toward the aspiration port 106 when engaging and cutting the tissue 110. The bending of the inner sleeve 104 assist[s] in cutting the tissue 110."); col. 6, ll. 59-61 (similar)). The Examiner agreed that Figures 6 and 7 did not disclose pre-bent tips. On September 14, 1998, Scieran amended claims 1, 22 and 24 to claim pre-bent tips, and enclosed a marked-up copy of Figure 6 to show the Examiner how the specification disclosed such pre-bent

tips (Tab 15, '640 appl.). The Examiner rejected the amended claims under § 112 because "the phrase 'said inner sleeve having a tip that is bent about said hinge' implies incorrectly that the tip is bent prior to the use of the instrument. In reality, the specification and drawings indicate that the tip is actually not bent prior to use and that it is only bent momentarily when engaging tissue..." (tab 19). Scieran abandoned that application.

The only disclosures in the '111 patent of an inner sleeve with a tip with a pre-existing bend are figures 27-29. Those figures do not, however, have circumferential slits (*see* cols. 13, 14, discussing figs. 27-29).

INTERROGATORY NO. 9:

State by dollar amount per year, all of Bausch & Lomb's volume of sales and sales revenue by customer, and gross and net profit, for each of its products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter, ever sold or offered by sale by Bausch & Lomb, resale or use in [sic] the United States and state how each amount was calculated, and identify all documents you referred to.

RESPONSE:

In addition to the General Objections, B&L objects to identifying sales by customer, to identifying gross and net profit, and to stating how each amount was calculated, because such information is not relevant to the claim or defense of any party, because it would be burdensome to do so, and because the identity of B&L's customers is confidential. Scieran's counsel has advised the Court that Scieran is not seeking discovery of such profit information (May 3, 2005 Disc. Conf. Tr. at 18 "[W]e're not looking to anything from Bausch & Lomb on their internals because their costs are irrelevant to our damage model. We just need to know their sales, numbers of units, then we'd have to apply our own information about profit margins and costs and marketing and so on."). Subject to these objections, pursuant to Fed. R. Civ. P.

33(d), B&L refers to B&L 2469-2736 and 5456-5557, from which annual sales of the CX4804 and CX5825 Lightning cutters may be derived or ascertained, by units sold and dollars.

INTERROGATORY NO. 10:

State by dollar amount, by year, the cost of manufacture and cost of sale to Bausch & Lomb for each of its products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter, ever manufactured, sold or offered by sale by Bausch & Lomb, resale or use in [sic] the United States, state how each amount was calculated, and identify all documents you referred to.

RESPONSE:

In addition to the General Objections, B&L objects to this interrogatory because such information is not relevant to the claim or defense of any party and because it would be burdensome to provide it. Scieran's counsel has advised the Court that Scieran is not seeking discovery of such cost information (May 3, 2005 Disc. Conf. Tr. at 18 "[W]e're not looking to anything from Bausch & Lomb on their internals because their costs are irrelevant to our damage model. We just need to know their sales, numbers of units, then we'd have to apply our own information about profit margins and costs and marketing and so on.").

INTERROGATORY NO. 11:

State Bausch & Lomb's administrative and overhead costs associated with the manufacture and sale by Bausch & Lomb of each of its products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter. When stating Bausch & Lomb's administrative and overhead costs, you should state how each amount was calculated and should identify all documents you referred to.

RESPONSE:

In addition to the General Objections, B&L objects to this interrogatory because it seeks information not relevant to the claim or defense of any party and because it would be burdensome to provide it. Scieran's counsel has advised the Court that Scieran is not seeking discovery of such information (May 3, 2005 Disc. Conf. Tr. at 18 "[W]e're not looking to

anything from Bausch & Lomb on their internals because their costs are irrelevant to our damage

model. We just need to know their sales, numbers of units, then we'd have to apply our own

information about profit margins and costs and marketing and so on.").

INTERROGATORY NO. 12:

State by dollar amount, and by year all Bausch & Lomb's volume of sales revenue by customer, and gross and net profit, for sales of spare parts used in connection with your products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter, and state how each amount was calculated, and identify all documents you refer to.

RESPONSE:

In addition to the General Objections, B&L objects to identifying sales by

customer, to identifying gross and net profit, and to stating how each amount was calculated,

because such information is not relevant to the claim or defense of any party, because it would be

burdensome to do so, and because the identity of B&L's customers is confidential. Scieran's

counsel has advised the Court that Scieran is not seeking discovery of such profit information

(May 3, 2005 Disc. Conf. Tr. at 18 "[W]e're not looking to anything from Bausch & Lomb on

their internals because their costs are irrelevant to our damage model. We just need to know

their sales, numbers of units, then we'd have to apply our own information about profit margins

and costs and marketing and so on."). Subject to these objections, pursuant to Fed. R. Civ. P.

33(d), B&L refers to B&L 2469-2736 and 5456-5557, from which sales of the CX4804 and

CX5825 Lightning cutters may be derived or ascertained, by units sold and dollars.

INTERROGATORY NO. 13:

Identify the person or persons most familiar with the process of electronic storage of your information pertaining to design and sales of your products that include an inner cannula used or designed to be used in a disposable high-speed vitrectomy cutter, including but not limited to electronic mail, correspondence, CAD files, reports, memorandums, and databases, describe how and on what media such information is stored and where such information resides, and identify all document retention policies.

RESPONSE:

        Subject to the General Objections, B&L identifies Dennis Boyer.  Pursuant to

Fed. R. Civ. P. 33(d), B&L refers to B&L 5439-5455, its document retention policy.

                                    MORRIS, NICHOLS, ARSHT & TUNNELL

                                    Jack B. Blumenfeld (#1014)
                                    Leslie A. Polizoti (#4299)
                                    1201 N. Market Street
                                    P.O. Box 1347
                                    Wilmington, DE  19899
                                    (302) 658-9200
                                    *Attorneys for Bausch & Lomb Incorporated*

May 6, 2005

458023

<u>CERTIFICATE OF SERVICE</u>

I, Leslie A. Polizoti, hereby certify that copies of the foregoing were caused to be

served on May 6, 2005 upon the following in the manner indicated:

**<u>BY HAND</u>**

Josy W. Ingersoll
YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE  19899


**<u>BY FEDERAL EXPRESS</u>**

Edward O'Connor
Craig McLaughlin
O'CONNOR CHRISTENSEN & MCLAUGHLIN LLP
1920 Main Street, Suite 150
Irvine, CA  92614

Leslie A. Polizoti

# VERIFICATION

I, Craig E. Larson, Esq., am Vice President and Assistant General Counsel of Bausch & Lomb Incorporated. The responses in Bausch & Lomb's Responses to Scieran Technologies' First Set of Interrogatories are true and correct to the best of my knowledge, information and belief, but the responses are in part based upon information supplied by others.

I declare under perjury that the foregoing is true and correct.

Craig E. Larson, Esq.
Vice President and Assistant General Counsel
Bausch & Lomb Incorporated

May 10, 2005