# EXHIBIT 12

Case 1:04-cv-01319-SLR     Document 82-12     Filed 09/28/2005     Page 1 of 12

1

VOLUME 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SCIERAN TECHNOLOGIES,    )
INC.,                    )
                         )
    Plaintiff,           )
                         )
    v.                   ) C.A. No. 04-1319 (SLR)
                         )
BAUSCH & LOMB,           )
INCORPORATED,            )
                         )
    Defendant.           )

            Videotape deposition of RODNEY L. ROSS
taken pursuant to notice at the law offices of Morris
Nichols Arsht & Tunnell, 1201 North Market Street,
18th Floor, Wilmington, Delaware, beginning at 9:35 a.m.,
on Thursday, August 11, 2005, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.
APPEARANCES:
        CRAIG McLAUGHLIN, ESQUIRE
        O'CONNOR CHRISTENSEN & McLAUGHLIN, LLP
           1920 Main Street - Suite 150
           Irvine, California 92614
           for the Plaintiff
        JACK B. BLUMENFELD, ESQUIRE
        LESLIE A. POLIZOTI, ESQUIRE
        MORRIS NICHOLS ARSHT & TUNNELL
           1201 North Market Street - 18th Floor
           Wilmington, Delaware 19801
           for the Defendant

ALSO PRESENT:
        PAUL J. LERNER
        GENERAL PATENT CORPORATION

        CAROL FEELEY
        DISCOVERY VIDEO SERVICES
              WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477




WILCOX & FETZER LTD.
Registered Professional Reporters

3

```
 1                    RODNEY L. ROSS,
 2        the witness herein, having first been
 3        duly sworn on oath, was examined and
 4        testified as follows:
 5  BY MR. BLUMENFELD:
 6       Q.    Good morning, Mr. Ross.
 7       A.    Good morning.
 8       Q.    How are you today?
 9       A.    Good.
10       Q.    Where do you live?
11       A.    Mission Viejo, California.
12       Q.    Where is Mission Viejo?
13       A.    Street address is 23569 Castle Rock.
14       Q.    Where do you work?
15       A.    I manage four companies.
16       Q.    What are the four conditions?
17       A.    Med-Logics, Enlighten Technologies, VersEye, and
18  Scieran Technologies.
19       Q.    When you say you manage them, what does that
20  mean?
21       A.    Well, I'm CEO of Med-Logics and president and
22  CEO of the other three.
23       Q.    What business is Med-Logics in?
24       A.    Refractive surgery.
```

Rodney L. Ross

4

1  Q.  Is that lasik?
2  A.  That's part of it.
3  Q.  Is it all eye surgery?
4  A.  Yes.
5  Q.  How many employees does Med-Logics have?
6  A.  Approximately a dozen I'd say.
7  Q.  And what business is Enlighten Technologies in?
8  A.  Developing new cataract-removal technology.
9  Q.  And how many employees does that company have?
10 A.  I would say one.
11 Q.  One other employee?
12 A.  Just one.
13 Q.  Are you the only employee?
14 A.  Uh-huh.
15 Q.  Does Enlighten actually sell products?
16 A.  No.
17 Q.  What does it do?
18 A.  As I mentioned, it's developing new
19 cataract-removal technology.
20 Q.  Are you developing that technology yourself?
21 A.  No.  I employ outside consultants to do that.
22 Q.  And what business is VersEye in?
23 A.  Developing a digital technology for the visually
24 impaired.

1    Q.    How many employees does VersEye have?
2    A.    Three.
3    Q.    Does VersEye have products on the market?
4    A.    No.
5    Q.    Does Med-Logics have products on the market?
6    A.    Yes.
7    Q.    And what business is Scieran in?
8    A.    We developed a vitrectomy device.
9    Q.    When did you develop a vitrectomy device?
10   A.    I think we started at the end of 1995.
11   Q.    And when did you finish the development of that
12 device?
13   A.    Seemed like that was in sometime, I think, in
14 1997.
15   Q.    And what was the name of that device?
16   A.    The Vit Commander.
17   Q.    Who came up with the name Vit Commander?
18   A.    I did.
19   Q.    Who came up with the name Scieran?
20   A.    I'm not sure.  That could have been a
21 collaboration that I had with Alan Schechter.
22   Q.    Why are you not sure?
23   A.    I just don't recall how that developed.
24   Q.    Who is Alan Schechter?



Rodney L. Ross

25

1  you attempted to make sure were maintained?
2       A.   I was more focused on the things pertaining to
3  the patent.
4       Q.   And tell me what those things were.
5       A.   Like copies of our patents and competitive
6  patents or other patents or -- I tried to keep everything
7  that would pertain to patent-related matters.
8       Q.   Did you try to keep documents relating to the
9  development of the Vit Commander?
10      A.   I tried -- yeah, I tried to keep as many as I
11 could afford to store.
12      Q.   And were some that you couldn't afford to store
13 destroyed?
14      A.   I don't recall throwing the Vit Commander -- I
15 don't recall throwing away any of those files.
16      Q.   Do you remember what files there were back from
17 1995 to 1997 about the development of the Vit Commander?
18      A.   No, I don't.
19      Q.   Do you know what files exist today from 1995 to
20 '97 about the development of the Vit Commander?
21      A.   I think any files that I had, I sent those to
22 you.
23      Q.   What about the testing of the Vit Commander from
24 1995 to 1997, what happened to those documents?

1    THE WITNESS: Not to my knowledge.
2    BY MR. BLUMENFELD:
3        Q.  Did you tell Mr. Yorks that there was any
4    relationship?
5        A.  Yes.
6            MR. McLAUGHLIN: Objection.
7    Attorney/client privilege. Instruct the witness not to
8    answer.
9            MR. BLUMENFELD: Let's mark as Defendant's
10   Exhibit 51 a document dated March 13, 1997, ST1681 to 82,
11   from Ken Chettleburgh to Mr. Ross.
12           (Defendant's Deposition Exhibit No. 51 was
13   marked for identification.)
14           THE WITNESS: Okay.
15   BY MR. BLUMENFELD:
16       Q.  Can you tell me what Defendant's Exhibit 51 is,
17   Mr. Ross?
18       A.  If I recall correctly, we were trying to put the
19   port more distal to the end, to the distal tip of the
20   outer cutter.
21       Q.  And what were you having Mr. Chettleburgh do?
22       A.  That was at Hart, as I recall, we were trying to
23   get him to put the port, the outer port, closer to the
24   end, and they were having a tough time doing that.

Rodney L. Ross

108

```
1    Q.   Well, let's go through this.  The first page of
2  this document, it says, "Mr. Ron Ross."  It should be
3  "Rod," right?
4    A.   Correct.
5    Q.   It says, "Hart has completed it's [sic]
6  evaluation of the sample cutters we received on March 12,
7  1997 and March 13, 1997."
8             Were those cutters that were received from
9  you?
10   A.   Probably -- I would assume Gregg Hughes.
11   Q.   I meant from Scieran.
12   A.   Okay.
13   Q.   And it says, "A copy of my findings are attached
14 for your review."
15            Do you see that?
16   A.   Yes.
17   Q.   Now, had you asked Mr. Chettleburgh to evaluate
18 the sample cutters?
19   A.   As I recall, we were trying to -- we were
20 looking at different other cutters and trying to get Hart
21 to place the port closer to the end because that's what
22 doctors want.
23   Q.   The port being on the outer cutter?
24   A.   Correct.
```



Rodney L. Ross

109

1  Q. And what kind of business is Hart Enterprises
2  in?
3  A. They make a lot of different products, and some
4  of them are cannula-type products.
5  Q. And Mr. Chettleburgh was the chief engineer at
6  Hart, right?
7  A. I don't remember his position -- yeah, it says
8  here "Chief Engineer."
9  Q. And what he was evaluating was the Storz cutter
10 assembly that you sent him?
11 A. Right.
12 Q. Those were Storz MicroVit assemblies, right?
13 A. Yes.
14 Q. And in the -- in the analysis first he talks
15 about the outer cutters. Do you see that?
16 A. Yes.
17 Q. And then he talks about the inner cutters. And
18 then the third paragraph on the inner cutters he wrote:
19 "Storz cutting end is flaired [sic] about .001 total.
20 This forces the inner cutter end out the port and then it
21 is forced back in the tubing, resulting in zero
22 clearance. We believe this may be causing it to cut
23 better."
24                 Do you see that?

1    A.   Yes.

2    Q.   And what he was talking about there was the
3 Storz MicroVit having zero clearance and thereby having a
4 spring effect on the outer cutter of the device, right?

5         MR. McLAUGHLIN:   Objection.  Calls for a
6 legal conclusion.

7    A.   I don't see the word "spring effect" here.

8    Q.   Right, but you understand that, when you have
9 zero clearance between the inner cutter and the outer
10 cutter, you're going to cause a spring effect of the
11 inner cutter on the outer cutter, right?

12   A.   I don't know that a spring effect is required to
13 do that.

14   Q.   Well, what do you think that means when it says
15 the inner cutter is forced out of the end of the port and
16 then forced back in the tubing?  Doesn't that tell you
17 that there was a spring force from the outer -- from the
18 inner cutter to the outer cutter?

19   A.   First of all, I'm not an engineer, and it
20 doesn't say "spring force" here.

21   Q.   It doesn't use the words "spring force," but it
22 talks about the inner cutter being forced out of the port
23 on the outer cutter, right?

24   A.   There's an assumption to be made there.

1  Q.  And what's that assumption?

2  A.  If it comes out of the port, that there's a
3  spring effect.  And I don't know if that's required.

4  Q.  You just don't know one way or the other?

5  A.  I don't know one way or the other.

6  Q.  In the next paragraph Mr. Chettleburgh says,
7  "Storz has a different slot configuration.  It is at the
8  end.  This may help evacuation of tissue."

9      Do you see that?

10 A.  Uh-huh.

11 Q.  You understood that he was talking about a slot
12 configuration at the end of the inner cutter, right?

13 A.  Yeah.

14 Q.  But you knew in March of 1997 that the Storz
15 MicroVit had a slot at the end of the inner cutter,
16 right?

17 A.  No.  Because I don't know what slot he's talking
18 about, because the only cutters we got were the standard
19 Storz pneumatic cutters.  They offer two different types
20 of cutters.  That's all we had for them to evaluate.

21 Q.  Right, and you knew that whichever one he
22 evaluated had a slot at the end of the inner cutter,
23 right?

24 A.  No.  I don't believe that's the case, because

1   A.   But if I saw Ocutome, I probably didn't even
2 read it because at that time it wasn't even on the
3 market.
4   Q.   It wasn't on the market. It had been on the
5 marked earlier than your patent?
6   A.   Correct.
7   Q.   And you weren't interested when you had patent
8 applications pending and knowing what the prior art that
9 someone handed you was?
10          MR. McLAUGHLIN: Objection. Misstates
11 testimony. It's argumentative.
12   A.   I don't even know if I read any of this.
13   Q.   Do you know that you didn't read it?
14   A.   When I found it in my files, I didn't even
15 recall having it.
16   Q.   Can we agree that it wasn't cited to the Patent
17 Office in connection with the applications for your
18 patents?
19          MR. McLAUGHLIN: Objection. The patent
20 document is what it is, a legal document. You can make
21 your arguments about whether it was in there or not at
22 some future time.
23          MR. BLUMENFELD: Why don't we take a break.
24          THE VIDEOGRAPHER: Going off the record at